JUDGE ENGELMAYER

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CHINA FUND, INC., and JOE O. ROGERS,<br><br>    Plaintiffs,<br><br>  v.<br><br>CITY OF LONDON INVESTMENT GROUP PLC, CITY OF LONDON INVESTMENT MANAGEMENT COMPANY LIMITED, BARRY M. OLLIFF, EMERGING MARKETS COUNTRY FUND,<br><br>    Defendants. | **18 CV 2918**<br><br>Civil Action No. ____ |

## VERIFIED COMPLAINT

### NATURE OF THE ACTION

1.    This case concerns the false and misleading statements Defendants have made and are making in their solicitation of proxies to be voted at the upcoming 2018 Annual Meeting of Stockholders (the "Annual Meeting") of The China Fund, Inc. ("China Fund"), in violation of Section 14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder. The Fund is a closed-end investment company, registered under the Investment Company Act of 1940 (the "1940 Act"), that owns and manages a portfolio of China-related securities. Like most similar funds, the Fund relies on the services of an external investment adviser to manage its securities portfolio. Defendants control over 27% of the Funds' outstanding voting stock.

2.    Defendants are soliciting votes by the Fund's stockholders in support of Defendants' proposal to remove — but not replace — the Fund's investment adviser, Allianz Global Investors U.S. LLC ("Allianz") (the "Termination Proposal"). If the Termination Proposal is approved by the Fund's stockholders, the Fund will be unable to operate, and likely will have to liquidate, unless

a replacement adviser is appointed within a few months.  Pursuant to the requirements of the 1940 Act, that replacement must be approved in advance by another vote of the Fund's stockholders. Because of the number of shares they control, Defendants can block any such vote.  Defendants have not identified any replacement adviser they would be willing to vote for, nor have they committed to support and vote for whatever replacement the Fund's board of directors (the "Board") might select and recommend.

3.      In their proxy materials, Defendants have falsely misrepresented that the Board can act alone to appoint a replacement adviser.  That is untrue because, as explained above, the 1940 Act requires otherwise.  Defendants also have conveyed through their proxy materials that their proposal to remove Allianz poses no threat to the Fund's ability to continue operating.  That also is clearly untrue: removing an adviser without simultaneously obtaining approval of a replacement is inherently risky because at a minimum, there exists the possibility that no replacement adviser will be found that can garner the requisite stockholder vote.  If a large stockholder is intent on blocking a replacement vote, the risk of course is much greater.

4.      Based on Defendants' recent statements, Plaintiffs believe Defendants have no intention of voting for *any* replacement adviser, because by blocking the appointment of a replacement for Allianz, Defendants can force the Fund to liquidate, which is their true objective. In a speech last year, Defendant City of London Investment Group plc's CEO, Defendant Barry Olliff, described how a remove-but-not-replace vote was a ***"nuclear option"*** that Defendants used as a threat against another fund, resulting in its liquidation.  Mr. Olliff warned that closed-end funds (like the China Fund) were "effectively a target for liquidation as far as we are concerned" and that "the nuclear option" was "one that we are increasingly prepared to use."   In opposing the Board's proposal last year to terminate and replace the Fund's investment adviser, City of London

stated that it "intend[ed] to propose termination of the Fund's investment agreement regardless of the outcome of the vote" on the Board's proposal to replace the investment adviser and that "Liquidation of the Fund will be the Eventual Outcome." The plan City of London announced last year is what City of London is pursuing now, but in seeking proxies to terminate the existing investment agreement, City of London has wrongfully failed to disclose to stockholders — indeed, it has denied — its liquidation scheme.

5.     The "nuclear option" is devastating because, under Section 15 of the 1940 Act, the appointment of any new adviser by a registered investment company requires a favorable vote of the "a majority of the outstanding voting securities" of the Fund, which is defined in Section 2(a)(42) of the 1940 Act as:

> (A) of 67 per centum or more of the voting securities present at such meeting, if the holders of more than 50 per centum of the outstanding voting securities of such company are present or represented by proxy; or (B) of more than 50 per centum of the outstanding voting securities of such company, whichever is the less.

6.     Because of this voting requirement, Defendants hold an effective veto over the appointment of any new adviser through their control of a large block of the Fund's voting stock. Last year, Defendants were able to block the appointment of a new adviser for the Fund, even though nearly 90% of the shares that were voted and not controlled by Defendants were voted in favor. Since then Defendants have acquired control over even more shares in the Fund. If the Termination Proposal is approved, and Defendants block appointment of a replacement and as a result the Fund is left without an investment adviser, the Fund will be unable to function properly to serve stockholders' interests. In those circumstances, liquidation becomes the only realistic outcome.

7.      In their proxy materials Defendants misleadingly suggest that appointment of a new adviser is solely within the control of the Board, and appointing a replacement will be straightforward. For example, Defendants state:

- If Allianz is terminated, the Board can hire an interim Manager for up to 150 days, which we believe would provide *adequate time for the Board to find a suitable replacement*.

- It is the Board's duty to assess the Fund's investment manager. *If Allianz is terminated, the Board must simply do its job and find another manager.* The Fund can hire an interim manager, including Allianz, to manage the Fund until it can find a suitable replacement, for up to 150 days.  As the Fund's largest stockholder, we are confident our investment will not be put at risk and *the Board*, by acting reasonably and in the best interests of the stockholders, *will be able to find a superior investment manager to replace Allianz.*

- We are confident that the Board . . . will be able to find a superior investment advisor to replace Allianz as the investment advisor of the Fund in a smooth transition.

- Join with us and sign and return to us the enclosed . . . proxy card . . . to terminate the investment advisory and management agreements with the Fund's investment advisor, so that *the Board . . . will be able [to] retain* a truly first rate advisor.

8.      In their proxy materials Defendants disavow any plan to have the Fund liquidate, stating they are making the Termination Proposal "to ensure that the Fund is managed properly in the future. . . " Defendants' own words contradict this representation of intent.  When Defendants blocked the appointment of a new adviser for the Fund last year, they noted that rejection of the then-proposed new adviser "could push the Fund closer to liquidation."   Defendants announced their Termination Proposal in September 2017 in a letter in which they stated "Liquidation of the Fund will be the Eventual Outcome . . . this Fund has no future . . . The Board should now take steps to begin the process of liquidating the Fund."

9.      In 2018, Defendants began disseminating proxy materials that contain no reference to their avowed liquidation objective.  Instead, Defendants have dismissed concerns raised by the

Board regarding Defendants' liquidation objective as "alarmist" and "hyperbole," and by issuing this statement:

> **WE ARE NOT PROPOSING LIQUIDATION** – The Board is misleading you by saying that we plan to liquidate CHN. . . .

10.     The first part of that statement is literally true – the Termination Proposal does not invite the Fund's stockholders to approve a formal plan of liquidation.  It is also entirely misleading, because it conveys to stockholders that liquidation is neither an objective nor even a probable result of the Termination Proposal.

11.     Plaintiffs believe the reason Defendants publicly admitted their liquidation objective in late 2017 but started denying it in early 2018 is that they decided they wouldn't get the requisite stockholder vote if they continued admitting their investment objective.  That would be understandable: the Fund's stock was up 47% in 2017, so its stockholders likely wouldn't rush to end its existence.  But the fact that Defendants' concealment of the truth is understandable doesn't make it legal.  Instead, together with Defendants' earlier public pronouncements it supports the inference that Defendants' material misrepresentations and omissions regarding the purpose and likely consequences of the Termination Proposal are intentional.

12.     Defendants' misleading statements have changed the overall mix of information available to the Fund's stockholders regarding their voting decision.  A leading proxy research and vote recommendation company, Institutional Shareholder Services Inc. ("ISS"), adopted Defendants' misstatements and declared (inaccurately) that if the Termination Proposal is adopted it will be "utterly within the board's control" to find a new adviser.

13.     Defendants subsequently disseminated supplemental proxy materials, touting and quoting (and thereby adopting) ISS's incorrect statement that:

> To the extent shareholders have a risk here; therefore, it would appear the root cause of the risk would be the current director[s'] unwillingness to

fulfill their responsibilities to shareholders by taking any action at all. Put another way, the root cause of the risk the board posits would have to be... the board itself.

14.     Beginning shortly after ISS published its report, large numbers of shares were voted in favor of the Termination Proposal, including by stockholders that previously had advised the Fund they would vote against the Termination Proposal. Before ISS succumbed to Defendants' deceptions, the Fund's proxy voting projections indicated the Termination Proposal would not pass. Based on the share voting since ISS published its report, the Fund projects that, if the relief sought here is not granted, the Termination Proposal will pass. Defendants' own projections show the same thing.

15.     After ISS issued its erroneous report, Plaintiffs asked it to reconsider. To date ISS has not done so. Faced with the prospect of a stockholder vote tainted by the Defendants' deception, as adopted by ISS, the Board postponed the stockholder meeting to April 26, 2018.

16.     Defendants apparently are concerned that the Fund's stockholders will recognize their deception between now and the rescheduled meeting and change their votes. On March 30, 2018, Defendants sued the Fund and its directors in a Maryland state court seeking to "freeze" the vote and declare the Termination Proposal was approved by the stockholders as of the previously-scheduled meeting date. The "freeze-the-vote" order sought by Defendants in the Maryland action is extraordinary and unprecedented, and well illustrates the contempt Defendants have for the other stockholders of the Fund. It would deprive all those other stockholders of (1) their right, guaranteed by federal and state law, to revoke any proxies they previously may have given, at any time up to the time of the stockholder vote, and (2) their right under Maryland law to vote as they wish (and whether or not they previously have furnished proxies) at the stockholder meeting or by proxy at any time up to the time of the stockholder vote. What Defendants are asking the Maryland court to do is, in effect, to enjoin all the other China Fund stockholders (who together hold over

72% of the stock) from changing their votes or from voting anew, and to nullify any such actions taken since the original meeting date.

17.     The Fund is confident that Defendants' disgraceful Maryland action will fail. Meanwhile, it is urgent that Defendants' false and misleading statements stop and that they correct them. Defendants must stop telling the Fund's stockholders that the Termination Proposal has only upside, and must instead explain that it presents a serious risk of leaving the Fund without an investment adviser and unable to operate. Defendants must acknowledge their past statements in favor of liquidation and clearly state whether liquidation is an outcome Defendants seek or favor. Defendants should state what commitment, if any, they are prepared to give that they will vote for a replacement adviser nominated by the Board if the Termination proposal is approved by stockholders. They must acknowledge that without their vote no long-term replacement can be appointed.

18.     Accordingly, this action seeks equitable relief to restrain the dissemination of, and to cure the harm caused by, Defendants' material misrepresentations before the Annual Meeting. Specifically, this Court should issue:

- A temporary restraining order and a preliminary injunction restraining Defendants from any further dissemination of their false and misleading statements;

- A preliminary and permanent injunction invalidating any proxies Defendants have collected and requiring Defendants to issue a corrective disclosure prior to any future solicitation of proxies concerning the Termination Proposal.

19.     Absent this relief, the China Fund and its stockholders face a substantial and imminent risk of irreparable harm. The Fund's adviser will be terminated on false pretenses, and as a result of Defendants' "nuclear option," the Fund will be placed in a commercially unviable position and forced to liquidate. Absent immediate action to stop Defendants' continued

dissemination of misstatements, the false impressions created by Defendants' falsehoods will become even more rooted and more difficult to cure.

20.     The balance of equities heavily favors such relief.  On the one hand, the Fund and its stockholders have a strong interest in the Fund's future being decided on a vote that is fully informed and not tainted by Defendants' misrepresentations.  On the other, there is no immediate need to consider the Termination Proposal prior to putting in place corrective disclosures and a re-solicitation of proxies on an honest basis.

## THE PARTIES

21.     Plaintiff China Fund is a non-diversified, closed-end management investment company incorporated under the laws of Maryland and with its principal place of business in Massachusetts.  China Fund shares trade on the New York Stock Exchange, and several stockholders reside in or are based in New York.

22.     Plaintiff Joe O. Rogers is an individual residing in North Carolina.  As of today's date, Mr. Rogers owns 3,245 shares of stock in the Fund.  Mr. Rogers is Chairman of the Board of the Fund and has served as a director of the Fund since 1992.

23.     Defendant City of London Investment Group plc ("CLIG") is a public limited company incorporated under the laws of England and Wales.  Its principal place of business is in London, England.  It is listed on the London Stock Exchange and files disclosure documents as required by the Exchange.  It is the parent holding company for the City of London group of companies (collectively "City of London"), including City of London Investment Management Company Limited.

24.     City of London Investment Management Company Limited ("CLIM") is a wholly-owned subsidiary of CLIG and is a private limited company incorporated under the laws of England and Wales.  Its principal place of business is London, England.  It is a fund manager that

specializes in Emerging Market closed-end funds and provides investment advisory services to public and private investment funds and other investors.

25.     Defendant Barry M. Olliff is the Chief Executive Officer and Chief Investment Officer of CLIG. He founded the firm in 1991 and has been the CEO since April 15, 2013. Upon information and belief, he is an individual of unknown citizenship residing in Pennsylvania.

26.     Defendant Emerging Markets Country Fund ("EMC") is a private investment fund organized as a Delaware trust. Its principal place of business is London, England. Its investments in China Fund are managed by City of London.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to Section 27 of the Securities Exchange Act of 1934 ("1934 Act") because the claims asserted herein arise under Section 14(a) of the 1934 Act and Rule 14a-9.

28.     This Court has personal jurisdiction over Defendants because each Defendant issued proxy solicitation materials directed at the U.S., including in this District, with respect to securities listed on the New York Stock Exchange, such that the exercise of personal jurisdiction comports with Rule 4(k) of the Federal Rules of Civil Procedure and with the requirements of due process.

29.     Venue is proper under 28 U.S.C. § 1391(b) (2011) because, among other reasons, a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## BACKGROUND

### A.     China Fund and the Closed-End Fund Business.

30.     China Fund is a non-diversified, closed-end management investment company registered under the Investment Company Act of 1940, as amended (the "1940 Act"). China Fund's

investment objective is long-term capital appreciation which it seeks to achieve by investing primarily in equity securities of companies bearing some relationship to the People's Republic of China.

31.     Shares of stock in closed-end funds, like China Fund, are not redeemable by stockholders.  The price of closed-end country fund shares that trade on a secondary market is determined by the market and may be greater or less than the shares' net asset value ("NAV").  Typically, shares of closed-end funds trade at a price that is less the shares' NAV.  Shares of the China Fund do as well, and the discount to NAV is in the range of the Fund's peers.  For retail investors, however, a closed-end fund like China Fund offers investors access to emerging markets in a way that otherwise might be difficult or even impossible, as a practical matter, to accomplish.

32.     The interest of large institutional investors in the Fund, like Defendants, may be different.  Among other reasons, such firms have the resources to create and manage their own diversified portfolios of Chinese-related securities.  Such large institutional investors may have a short-term arbitrage strategy, leveraging their large positions to liquidate a closed-end fund in order to capitalize on any market discount to NAV.

**B.     China Fund's Relationship with Its External Adviser.**

33.     Like most closed-end funds, China Fund is externally managed.  The Fund's investment adviser is Allianz Global Investors U.S. LLC ("Allianz").  Allianz is a diversified active investment manager with a strong parent company and a culture of risk management.  With 25 offices, Allianz provides global investment and research capabilities with consultative local delivery.  It had $583 billion in assets under management for individuals, families and institutions worldwide as of September 30, 2017, and employs over 600 investment professionals.

C.     **Appointing and Terminating an Investment Adviser Under the Investment Company Act.**

34.     Under the 1940 Act, a fund's contract with its investment adviser must provide that the adviser can be removed upon notice to the adviser. Under Section 15 of the Investment Company Act, the contract must provide for notice not to exceed 60 days. 15 U.S.C. § 80a-15(a) (2004). China Fund's contract with Allianz provides for notice of 60 days.

35.     Nomination of a new investment adviser can only be through a written contract that satisfies the requirements of Section 15 of the Investment Company Act. *Id.* And that contract needs to be approved by both a "majority of the outstanding voting securities" and a majority of the board of directors. *Id.* § 80a-15(a), (c). The "vote of a majority of the outstanding securities of a company" is defined as the vote:

> (A) of 67 per centum or more of the voting securities present at such meeting, if the holders of more than 50 per centum of the outstanding voting securities of such company are present or represented by proxy; or (B) of more than 50 per centum of the outstanding voting securities of such company, whichever is the less

*Id.* § 80a-2(a)(42).

36.     When an investment adviser has been removed by a shareholder vote, the board may appoint a temporary investment adviser for a very limited period without the approval of a majority of outstanding voting shares. 17 C.F.R. § 270.15a-4(b). However, this can only happen if the compensation is no greater than under the previous contract, the board approves of the contract within 10 business days of the termination of the previous contract, and the interim contract lasts no longer than 150 days following the date of termination of the previous contract. *Id.* The Board cannot, without shareholder approval, appoint a new investment adviser to serve in the long-term.

**D.    City of London's Investment Strategy and the "Nuclear Option."**

37.    City of London is a fund manager specializing in emerging market closed-end funds. City of London currently owns 27.2% of China Fund's stock.  It has owned stock in the Fund continuously since 2013, and has steadily increased its holdings since that time.

38.    City of London and its CEO Defendant Barry Olliff have painted a bulls-eye on the entire U.S. closed-end fund sector.   They have declared the sector obsolete and requiring liquidation.  Specifically, they have expressed the view that the discounts to NAV trading typical to closed-end funds in the U.S. are unreasonably large.  In a public March 2017 presentation, Mr. Olliff explained that City of London's position is that:

> Ninety percent of US listed emerging market Closed-End Funds have traded at an average discount of more than 10% over the past rolling year.  *In just about every one of these funds we will therefore be voting against incumbent Directors and in any instance where we find that a Director is then held over we will propose termination under the 40 Act.*

Mr. Olliff further explained that:

> In the brave new world of *emerging market Closed-End Funds in the US*, my best guess is that under present circumstances less than 50% of the present available exposure will survive.  The other *50% will be liquidated over the next few years*.

Mr. Olliff described China Fund and other similar funds as obsolete, and warned that City of London would especially target for liquidation "any legacy fund trading at over 10% discount":

> "What will happen as the present all market and emerging market equities develops – remember that it's now up 40% since the low end February 2016 – is that a new breed of better designed, lower cost, conflict of interest free, well advised emerging market Closed-End Fund product will emerge.  These products will replace the legacy products that are at the centre of today's presentation.  What this could mean is that *most of the present emerging market Closed-End Funds could have been liquidated and their assets returned to Shareholders*.  These new products, as in other parts of the world, will have discount controlled mechanisms.   Their Directors will have term limits and will be held accountable.

Lawyers will not run or administer them.  Fees will be competitive. Benchmarks will be relevant and they will have active nomination and investment committees.  As referenced above, the sooner this happens the better because *any legacy fund trading at over 10% discount is now effectively a target for liquidation as far as we are concerned*.  Obviously, some of the existing products could convert to this model."

(emphasis added.)

39.    Mr. Olliff made clear that one of City of London's primary tactics to achieve a liquidation is to cripple a fund's ability to function through the "*nuclear option*" of seeking a stockholder vote to terminate the fund's adviser, without proposing a replacement.  City of London then can use its large block of stock to veto the appointment of a new adviser because the 1940 Act requires a "vote of a majority of the outstanding voting securities of [a] company."  The fund is left without an adviser and it can no longer function properly to manage its assets.  At that point, it makes little commercial or investment sense to continue and a liquidation typically follows.

40.    In the same March 2017 presentation, Mr. Olliff described City of London's use of the "nuclear option" with respect its investment in Korea Equity Fund, Inc. ("KEF"):

- "In this [KEF] incidence, we requisitioned under the 40 Act the *termination of the investment management contract*, as you will be aware, whose fund is being liquidated and all assets are being returned to Shareholders.  Whilst we have always considered this to be *the nuclear option*, preferring to the leave the governance of the funds to the board of directors, if Directors do not act in the interest of the Shareholders that they represent, *we will continue to use this mechanism.*"

- "I have referenced *the 1940 Act* on a couple of occasions during this presentation.  I also said that *its use is the nuclear option but one that we are increasingly prepared to use.*"

- "We will requisition under the 40 Act for termination of the investment management contract in the event that any Director is held over."

(emphasis added)

41.     City of London pursued a similar strategy with respect to JPMorgan China Region Fund ("JPMorgan China").   After City of London proposed terminating JPMorgan China's investment adviser, that fund liquidated in 2017.

**E.      City of London Makes Clear in 2017 its Goal to Liquidate the China Fund.**

42.     Later in 2017, City of London took aim at the China Fund, apparently with a view to implementing the playbook described in Mr. Olliff's March 2017 presentation.

43.     On March 31, 2017, the China Fund's Board announced that it was seeking stockholder approval for a proposal to replace the Fund's external investment adviser (Allianz) with another adviser (Open Door Investment Management, Ltd. ("Open Door")) that the Board believed would do a better job.   Selecting a new advisor to nominate was difficult in large part because various Fund stockholders had expressed a preference for advisers specializing in small-to-medium cap investment portfolios, and there are a limited number of such entities in the U.S. The Board engaged Towers Watson consultants to help find a potential replacement adviser, and after considering five potential candidates, selected Open Door.   Olliff seized the opportunity to launch a campaign avowedly aimed at liquidating the China Fund.   Mr. Olliff's statements made in opposition to the Open Door proposal leave no doubt as to his and City of London's intent to swiftly end the China Fund's corporate existence.   They included the following:

> By changing their votes to 'AGAINST' Open Door, *Stockholders could push the Fund closer to liquidation*.

(emphasis added)

> **Liquidation of the Fund will be the Eventual Outcome**
>
> For all the reasons discussed above, we believe that the Board has lost all credibility and that *this Fund has no future. As we have previously stated, we intend to propose termination of the Fund's investment agreement regardless of the outcome of the vote on Open Door*. The current deadline for the submission of a 14a-8 proposal is September 21, 2017. Our draft proposal to terminate the

> existing contract is attached, which would be amended if Open Door were selected.
>
> We urge the Board to immediately stop using Stockholder resources to attempt to overturn the result of the proxy votes. ***The Board should now take steps to begin the process of liquidating the Fund.***

(emphasis added).  That is, City of London made clear prior to seeking proxies in its effort to terminate Allianz as the China Fund's investment adviser that "the Eventual Outcome" of "termination of the Fund's investment agreement" with Allianz would be "Liquidation of the Fund."

44.    The proposal to replace Allianz with Open Door received 60% of the shares voted — nearly 90% of the voting shares not controlled by City of London — but fell short of the 50% of outstanding shares required by the 1940 Act.

45.    Given City of London's 24.93% stockholdings at that time, and accounting for the high incidence of non-voting by some stockholders, it was extraordinarily difficult to pass the Open Door proposal.

46.    Typically, many stockholders of the Fund do not vote at all.  Indeed, Defendants themselves state that stockholder turnout of 70% is "high."

47.    On the Open Door proposal, approximately 22.29% of the Fund's shares did not vote, *i.e.*, leaving a voting pool of only 77.71% of shares.  That meant that (i) the City of London's 24.93% position constituted 32.08% of the voting shares; and (ii) removing City of London and non-voting shares out of consideration, only 52.78% of outstanding shares remained to vote for the proposal.  The consequences of this simple math are severe.  To reach the 67% of voting shares threshold under the 1940 Act, the Open Door proposal needed virtually all, *98.65%,* of the voting shares not controlled by City of London to vote in favor.  To reach the alternative 50% of outstanding shares threshold under the 1940 Act, the Open Door proposal needed *94.73%* of the voting shares not controlled by City of London to vote in favor.

**F.      City of London Proposes to Terminate (But Not Replace) Allianz.**

48.      Even as City of London aggressively criticized the Fund and its management, it continued to increase its holdings.

49.      From August 2017 to March 2018, City of London increased its holdings from 24.9% to 27.2%. This increase has given City of London even greater leverage.  If City of London had held 27.2% of the Funds stock when voting on the Open Door proposal, based on the voting levels in that contest, it would have been ***mathematically impossible*** to reach the 67% of voting shares threshold necessary to retain Open Door; and would have required ***98.99%*** of voting shares not controlled by City of London to vote in favor to reach the 50% of outstanding shares threshold. And in any vote where turnout is at the 70% level that Defendants state is "high," City of London has a mathematically certain veto power.

50.      After Defendants succeeded in defeating the Open Door proposal, they began the next phase of their attack on the China Fund, by launching the current proxy contest.  Mr. Olliff did so in a letter dated September 11, 2017 that he sent on behalf of City of London.  In the letter, Mr. Olliff served notice of the Termination Proposal, invoking an SEC rule (Rule 14a-8) that required the China Fund to include the Termination Proposal in the China Fund's own proxy statement.  The Termination Proposal is the same "nuclear option" Mr. Olliff described in his March 2017 speech.  That fact, Mr. Olliff's other public pronouncements, and the contents of Mr. Olliff's September 11, 2017 letter, leave no doubt as to Defendants' desire to end the China Fund's existence.  In his letter, Olliff wrote:

> As we stated in previous letters, we believe that the Board has lost all credibility and that ***this Fund has no future***.  We have submitted a 14a-8 proposal to terminate the Fund's investment agreement in advance of the deadline of September 21, 2017.  Our proposal to terminate the existing contract is attached.

(emphasis added)

**G.     Defendants' False and Misleading Proxy Statement in Support of the Termination Proposal.**

51.     Rule 14a-8 is intended to give stockholders of a company access to the company's proxy statement, to save stockholders the expense and inconvenience of pursuing their own proxy solicitation.  But Defendants did both.  In addition to requiring the China Fund to disseminate their Termination Proposal, Defendants also disseminated their own proxy statement and supplemental proxy soliciting materials ("fight letters") soliciting support for the Termination Proposal.

52.     In the Fund's preliminary proxy statement filed on January 23, 2018, the Fund pointed out that Defendants' proposals were a "part of a plan to force the Fund to cease operations and liquidate," which was consistent with City of London's "preference for liquidation of the Fund" as it had made clear in earlier SEC filings.  The Fund noted that City of London was not proposing to replace Allianz, which would leave the Fund with no investment manager.  Finally, the Fund stated that the Board believed that the proposals were meant to place the Fund in a "seriously weakened position in which the Fund would have no choice but to submit to whatever further proposals EMC and City of London might then make" including "liquidation of the Fund" or some other "business combination proposal that EMC and City of London might propose" that "might be beneficial for City of London but not for other stockholders of the Fund."

53.     On January 31, 2018, Defendants CLIG, CLIM, Mr. Olliff and others filed on behalf of themselves and the funds they represent (*i.e.*, including Defendant EMC), the "Definitive Proxy of Emerging Markets Country Fund," seeking to solicit proxies in support of certain proposals at the upcoming annual meeting.  In particular, Defendants solicited proxies in support of their proposals to, among other things:

> 1.     Elect City of London's two (2) director nominees, Julian
>         Reid and Richard A. Silver . . . .

2. Terminate all investment advisory and management agreements between the Fund and Allianz. . . .

54. Although Defendants' previous filings in 2017 had been pugilistic (but clearly revealing) in the declarations of their view about the China Fund's supposedly having no future and needing to be put out of its misery through liquidation, Defendants now adopted a different approach.

55. Defendants apparently had concluded that belligerent pronouncements about the desirability of ending the China Fund's corporate existence would not garner sufficient support from China Fund's other stockholders. So Defendants now dressed the liquidation wolf in sheep's clothing, couching their appeal to other Fund stockholders in terms of good corporate governance, and the need to improve the China Fund's investment performance. For example, Defendants cited what they described as the Fund's "Excessive Discount to Net Asset Value," of 13.7% in 2016 and 10.6% in 2017. (These figures reflect NAV discounts that would, according to Defendant Olliff's previous March 2017 presentation, trigger City of London's efforts to liquidate.)

56. To be sure, Defendants' proxy disclosures in early 2018 coyly left open the possibility of a liquidation outcome, even as they downplayed it. For example, Defendants said their nominees would "use their best efforts to cause the Board to evaluate all strategic alternatives" and that these alternatives included a share repurchase, "liquidating the Fund," or seeking the "consolidation of the Fund with one or more other closed-end funds focused on the emerging markets." (Defendants appeared to suggest the possibility of a merger with some other funds affiliated with City of London.)

57. But the overall message conveyed in Defendants' 2018 messaging was that Defendants were open to and would not oppose a new investment adviser for the Fund, and that liquidation was not their primary objective and was not going to be triggered by the Termination

Proposal. As the proxy contest continued, that deceptive coyness morphed into outright dishonesty, as Defendants sought to counter the China Fund's challenges, made through its proxy materials, as to Defendants' true intentions. As described below, Defendants' misstatements in their 2018 proxy materials have been extensive, and include the following:

58.     In their Definitive Proxy Statement, Defendants responded to what they called the Board's "greatly overblown" and "alarmist" claims regarding "the risk that the Fund will be without an investment manager":

> ***It is the Board's duty to assess the Fund's investment manager. If Allianz is terminated, the Board must simply do its job and find another manager***. The Fund can hire an interim manager, including Allianz, to manage the Fund until it can find a suitable replacement, for up to 150 days. As the Fund's largest stockholder, ***we are confident our investment will not be put at risk and the Board, by acting reasonably and in the best interests of the stockholders, will be able to find a superior investment manager to replace Allianz***. The Board's alarmist claims of the risk that the Fund will be without an investment manager are greatly overblown.

(emphasis added)

59.     In their Definitive Proxy Statement, Defendants also responded to what they called the Board's "hyperbole about what City of London's undisclosed intentions are with respect to the Fund." Defendants stated:

> ***Our goal is simple*** – to elect a Board that is committed to maximizing value for its stockholders after carefully reviewing all strategic alternatives. We are confident that ***our Nominees, if elected, will be able to identify outstanding replacement investment managers*** to the other members of the Board for their consideration, and ***a responsible Board, exercising their fiduciary obligations should be able to prevent a situation where the Fund does not have an investment manager***

(emphasis added). Defendants also stated that they were making the Termination Proposal "to ensure that the Fund is managed properly in the future . . . ."

60.     On February 1, 2018, Defendants CLIG, CLIM, Olliff and others filed with the SEC a letter to stockholders from Mr. Olliff on behalf of themselves and the funds they represent (*i.e.*, including Defendant EMC).  Defendants here repeated their false suggestion that the Board itself could appoint a new investment adviser:

- "[j]oin with us and sign and return to us the enclosed . . . proxy card . . . to terminate the investment advisory and management agreements with the Fund's investment advisor, so that the Board . . . will be able [to] retain a truly first rate advisor."

- ***"We are confident that the Board, with the input of our ethical and highly qualified Nominees, will be able to find a superior investment advisor to replace Allianz*** as the investment advisor of the Fund in a smooth transition."

(emphasis added)

**H.      After the Board Responds, Defendants Double-Down on Their False and Misleading Statements in Fight Letters and Other Proxy Materials.**

61.     On February 5, the Board issued its own definitive proxy statement.  The Board explained that if the Termination Proposal were adopted, "it is unlikely that the Fund would be able to engage another investment adviser (and obtain the required stockholder approval to do so) without City of London's support."  The Board further explained that there "is no reason to believe City of London would vote the appointment of a replacement adviser," and therefore, "[i]f the Termination Proposal were adopted, the Board believes that the Fund's stockholders likely would *not* feel free to vote no on a proposal [*e.g.*, liquidation or merger] presented by City of London or EMC" because of the risks of proceeding without an investment adviser.  (emphasis present)

62.     On March 7, 2018, Defendants CLIG, CLIM, Olliff and others filed with the SEC a City of London investor presentation on behalf of themselves and the funds they represent (*i.e.*, including Defendant EMC).  The presentation included the following statement:

If Allianz is terminated, the Board can hire an interim Manager for up to 150 days, which we believe would provide ***adequate time for the Board to find a suitable replacement***.

(emphasis added)

63.     During this same time period, Defendants sought to convince a leading proxy research and vote recommendation company, ISS, to recommend that stockholders vote in favor of Defendants' proposals.

64.     On March 12, 2018, Defendants CLIG, CLIM, Olliff and others filed with the SEC a City of London investor presentation on behalf of themselves and the funds they represent (*i.e.*, including Defendant EMC).  The presentation said, among other things, that:

- "Our Nominees are confident that the selection of a new manager could be achieved in a timely manner."

- "Nominees Have a Plan to Find a Qualified Manager . . . Dependent on the views of the whole CHN Board, the Nominees would request that the Board analyze every available manager who manages an open-ended or closed-ended fund, investing in China that is both suitable and available to US-based retail investors."

65.     Perhaps Defendants' most egregious misstatements were published shortly before ISS published its report on the China Fund proxy contest, and appear designed to deceive ISS into believing Defendants do not want a liquidation.  On March 14, 2018, Defendants CLIG, CLIM, Olliff and others filed with the SEC a City of London press release and letter to stockholders signed by Mr. Olliff on behalf of themselves and the funds they represent (*i.e.*, including Defendant EMC). In the letter, Mr. Olliff stated:

**WE ARE NOT PROPOSING LIQUIDATION** – The Board is misleading you by saying that we plan to liquidate CHN.  What we ARE proposing is to terminate the Fund's Manager, Allianz, an action the Board itself repeatedly attempted last summer.  Firing Allianz will not liquidate the Fund.

I.     **Based on Defendants' False and Misleading Proxy Materials, ISS Recommends Voting for the Termination Proposal.**

66.     The deception worked.  On March 16, 2018, ISS issued a "Proxy Analysis & Benchmark Policy Voting Recommendations" with respect to China Fund.  ISS recommended voting in favor of Defendants' proposals to elect new directors and to terminate Allianz.  ISS repeated Defendants' dishonest story in their own words, including as follows:

> As for the termination of Allianz, the concerns raised by the board relative to the potential disruption and liquidation of the fund amount to an argument that if, following approval of the dissident's proposal (and therefore the possible termination of Allianz), the board takes no additional action – and thus fails to select a new advisor – shareholders might face outcomes such as leaving the fund orphaned without an investment advisor, disrupting the fund's investment process, as well as liquidating the fund.  Some of these issues appear to be true; *it also, however, appears to be utterly within the board's control to eliminate this risk, literally by identifying a new advisor*.
>
> To the extent shareholders have a risk here; therefore, it would appear *the root cause of the risk would be the current director's unwillingness to fulfill their responsibilities to shareholders by taking any action at all*.  Put another way, the root cause of the risk the board posits would have to be… the board itself.

(emphasis added)

67.     The ISS Report's conclusions that it was "utterly within the board's control" to find a new adviser, and that the Board's "unwillingness" to find a new adviser was the "root cause" of any risk of terminating Allianz, were incorrect.  A new adviser can be appointed only by following the strict stockholder voting requirements of the 1940 Act.  And given the significant stockholdings of City of London, it would be impossible to do so without City of London's support.

J.     **Defendants Endorse and Repeat ISS's Incorrect Statement.**

68.     Defendants subsequently leveraged ISS's mistaken version of the facts in a self-congratulatory fight letter filed with the SEC as part of their proxy solicitation.  On March 19,

2018, Defendants CLIG, CLIM, Oliff and others filed with the SEC a City of London press release
and letter to stockholders signed by Mr. Olliff on behalf of themselves and the funds they represent
(*i.e.*, including Defendant EMC).  In the letter, Mr. Olliff quoted approvingly to stockholders (and
thus adopted) ISS's incorrect statement that:

> To the extent shareholders have a risk here; therefore, it would
> appear the root cause of the risk would be the current director's
> unwillingness to fulfill their responsibilities to shareholders by
> taking any action at all.  Put another way, the root cause of the risk
> the board posits would have to be… the board itself.

**K.    Effect of ISS's Recommendation on Stockholder Voting.**

69.    Defendants' successful deception of ISS has had dramatic effects on the solicitation
of proxies in advance of the upcoming meeting.

70.    On March 15, 2018, the day before the ISS Report was issued, holders of just 32.7%
of the Fund's outstanding shares of stock had delivered proxies in favor of the Termination
Proposal.  The Fund's proxy voting projections at that time indicated that the Termination Proposal
would not pass.

71.    However, by March 19, 2018, holders of 45.6% of the Fund's outstanding shares of
stock had delivered proxies in favor of the Termination Proposal.  By March 28, 2018, holders of
49.26% of the Fund's outstanding shares of stock had delivered proxies in favor of the Termination
Proposal.  Holders of 27.93% of the Fund's outstanding shares had not voted.  The Fund now
projects that, if the relief sought here is not granted, the Termination Proposal will pass.
Defendants' projections are to the same effect.

72.    The reason for this sudden swing in votes is clear: many investors rely on ISS's
recommendation, and some do so as a matter of corporate policy.  The Board has received
communications from several stockholders to this effect.  For example, representatives of one
stockholder, Wells Fargo, informed the Board that it was Wells Fargo's general policy to follow

ISS's recommendation, even though they had been inclined to oppose the Termination Proposal previously.

73.      Given the significant impact of the ISS Report, the Board has attempted to persuade ISS to revise its recommendation.  In particular, on March 19, 2018, the Board sent an e-mail to ISS pointing out ISS's incorrect assertion that the "adviser replacement issue is *'utterly within the board's control'*" and attempting to clarify ISS's misapprehension of that issue.  A representative of ISS replied to state that, while ISS would check the issue:

> [O]ur process involves adhering to ISS policy as well as multiple reviews of our contentious reports before they are issued to clients. As such, our vote recommendation to clients is unlikely to change at this time.

**L.      Postponement of Meeting.**

74.      On March 23, 2018, the Board postponed the Annual Meeting from March 27, 2018 to April 26, 2018.

75.      Because the record date for the annual meeting is February 2, 2018, the Fund's bylaws require that the annual meeting be held within 120 days thereof, *i.e.* June 2, 2018.  If the meeting is postponed beyond that 120-day period, a new record date would have to be set and all previously obtained proxies would be set aside.

**M.      Defendants Commence a Baseless Maryland Lawsuit Seeking to Disenfranchise the Fund's Stockholders.**

76.      Defendants apparently are concerned that any additional time afforded stockholders to consider the Termination Proposal might thwart Defendants' deceptive scheme.  On March 30, 2018, Defendants launched a baseless suit in Maryland state court, which would (i) prevent stockholders who have already given their proxies to Defendants from hearing more information and changing their minds; and (ii) prevent additional stockholders from participating in the upcoming Annual Meeting, perhaps turning the upcoming vote the other way (as it currently stands,

no proxies have been submitted for approximately 30% of the Fund's stock). Specifically, they are asking the court to take the extraordinary step of declaring that the Termination Proposal should be deemed already to have passed, as of the proxy tally on March 27, 2018, even though the Annual Meeting has not yet occurred. Specifically, Defendants request that the Maryland court:

        A.      Order that (a) the annual meeting must be conducted on April 26, 2018; (b) the Fund and Board are enjoined from further adjournments of the annual meeting; (c) votes taken by proxy as of March 27, 2018, shall constitute a quorum for purposes of the annual meeting, and (d) the vote is certified as of that date.

        B.      Declare that in the event the results of the annual meeting held on April 26, 2018, concerning Plaintiffs' nominees to the board and the termination of Allianz differ from the votes as of March 27, 2018: (a) the postponement of the annual meeting from March 27, 2018, to April 26, 2018, is void; (b) the annual meeting was held as of March 27, 2018; (c) votes taken by proxy as of March 27, 2018, shall constitute a quorum for purposes of the annual meeting, and (d) the vote is certified as of that date.

77.     Mr. Olliff also submitted a declaration in support of the Defendants' efforts to seek a preliminary injunction to this effect. In that declaration, Mr. Olliff was upfront that he was concerned that the Board might "use the extra time to convince stockholders who have already voted to change their vote, or convince stockholders that have not yet voted to cast a ballot."

78.     There is no legal or equitable basis for this astounding request to disenfranchise the Fund's stockholders and prevent them from voting at the Annual Meeting or changing their minds before then.

79.     Defendants' underlying claims rest on the completely fatuous arguments that (i) affording stockholders more time to consider the Termination Proposal somehow interferes with their ability to vote (when it is the relief sought by Defendants that actually would have that effect); (ii) because the Fund's Bylaws refer to an annual meeting in March, the Bylaws

adjournment provisions somehow do not apply; (iii) the postponement of the meeting by 30 days somehow entrenches the Board because also on the ballot is a proposal to replace two of the Board's seven independent directors.

80.     Notably, the Maryland Complaint — verified by Mr. Olliff — alleges that the Fund expressed concern that "City of London was making its proposals to effect a liquidation," but does not contain any statement straightforwardly stating that Defendants have no such intent.   The declaration that Mr. Olliff submitted to the court in that action is also tellingly silent about the Defendants' intentions.

81.     The Fund is confident that the Maryland court will reject Defendants' baseless claims.

### IRREPARABLE HARM TO CHINA FUND AND ITS STOCKHOLDERS

82.     In the meantime, Defendants false and misleading statements continue to poison the well and, if left uncorrected, will result in a vote at the upcoming Annual Meeting that is the result of fraud and deception.

83.     The issue of whether the Fund (or any other similar fund) will have continuous access to the services of an external investment adviser is critically important.   If, based on Defendants' false and misleading statements and omissions, the Termination Proposal is adopted, the Fund and its stockholders will suffer irreparable harm.   Thus, the Fund's adviser will be terminated on false pretenses, and as a result of Defendants' "nuclear option," the Fund will be placed in a commercially unviable position — indeed, the Fund's portfolio of investments will deteriorate without management, and the lack of a manager will impose various administrative and other expenses on the Fund — and will be forced to liquidate.   In that situation, the Fund could not function and likely would be forced to liquidate, and stockholders would thus no longer have the

exposure to China-based securities afforded to them by the Fund.  Notably, the Fund's stock price increased by 47.42% in 2017 and the Fund's NAV increased by 37.92%.  Absent immediate action to stop Defendants' continued dissemination of misstatements, the false impressions created by Defendants' falsehoods will become more deeply rooted and more difficult to cure.  In addition, the Fund has incurred substantial expense in addressing and responding to Defendants' false and misleading statements and omissions in City of London's proxy solicitations concerning the Termination Proposal.

## COUNT I
### (Violation of 15 U.S.C. § 78n and Rule 14a-9 promulgated thereunder)

84.     China Fund hereby repeats and realleges each and every allegation made in paragraphs 1 through 83 of this Complaint as if fully set forth herein.

85.     Defendants disseminated the false and misleading Proxy Materials, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, made false and misleading statements and/or omitted to state material facts necessary to make the statements therein not materially misleading. Defendants are liable as the issuer of these statements.

86.     Defendants' Proxy Materials, in particular the statements identified in Paragraphs 3-4, 7-9, 12-13, 58-60, 62, 64-65, and 68 of this Complaint are false and misleading because they:

- creates the false impression that stockholder approval is not required to appoint an investment adviser (i.e., that the Board alone has the power to appoint a new investment adviser);

- creates the false impression that Defendants are open to and will not oppose the appointment of an investment adviser;

- creates the false impression that Defendants do not by themselves have the voting power to effectively prevent the appointment of a new adviser;

- creates the false impression that Defendants do not seek to accomplish a liquidation, through the "nuclear option" or otherwise;

- 27 -

- omits to disclose Defendants' true intentions with respect to the Fund, *i.e.*, to liquidate the Fund (or undertake some other transaction to its benefit such as a consolidation with other funds in which City of London holds a large position).

87.     The Defendants were at least negligent in filing the Proxy Materials with these materially false and misleading statements and/or omissions.

88.     The false and misleading statements and omissions in the Proxy Materials are material in that a reasonable stockholder will consider them important in deciding whether to grant Defendants a proxy to vote on their behalf in connection with the Termination Proposal.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Materials and in other information reasonably available to stockholders.

89.     The Proxy Materials are an essential link in causing China Fund's stockholders to vote their proxies in favor of the Termination Proposal, which, if passed, will result in irreparable economic injury to the stockholders and the Fund.

90.     By reason of the foregoing, Defendants have violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

91.     Because of the false and misleading statements and omissions in the Proxy Materials, China Fund and its stockholders are threatened with irreparable harm.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment:

(i)     Preliminary and permanently enjoining Defendants and all persons acting in concert with them from soliciting any proxies based on the false and misleading statements and omissions described herein;

(ii)    Invalidating all proxies obtained in violation of Section 14 of the 1934 Act and Rule 14a-9 promulgated thereunder;

(iii)   Preliminary and permanently enjoining Defendants and all persons acting in concert with them from soliciting any proxies unless they issue corrective proxy materials that do not contain any false or misleading statements or omissions as described herein;

(iv)    Declaring that Defendants violated Section 14(a) of the 1934 Act as well as Rule 14a-9 promulgated thereunder;

(v)     Awarding Plaintiffs damages in an amount to be determined at trial;

(vi)    Awarding Plaintiffs the costs of this action, including reasonable allowance for attorneys' and other litigation expenses; and

(vii)   awarding Plaintiffs such other and further relief as the Court deems just and proper.

Dated: April 3, 2018
       New York, New York.

Respectfully submitted,

Anthony M. Candido
Robert Myers
John P. Alexander
Rijie Ernie Gao
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Plaintiffs The China Fund Inc. and Joe O. Rogers*

<u>VERIFICATION</u>

I, Joe O. Rogers, am the Chairman of the Board of Directors of China Fund and a plaintiff in this action. I have read the foregoing complaint and know the contents thereof, and the same is true to my own knowledge, except as to matters therein stated to be alleged on information and belief, which matters I believe to be true. I solemnly affirm under penalties of perjury that the contents of the foregoing papers are true.

Executed on 2 April, 2018

JOE O. ROGERS