**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CHINA FUND, INC., and JOE O. ROGERS,<br><br>       Plaintiffs,<br><br>  -against-<br><br>CITY OF LONDON INVESTMENT GROUP PLC,<br>CITY OF LONDON INVESTMENT<br>MANAGEMENT COMPANY LIMITED, BARRY<br>M. OLLIFF, EMERGING MARKETS COUNTRY<br>FUND,<br><br>       Defendants. | Civil Action No. 1:18-cv-02918-PAE |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

OLSHAN FROME WOLOSKY LLP
*Attorneys for Defendants*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

## Table of Contents

Page

Preliminary Statement.................................................................................................1

Statement of Facts.......................................................................................................5

    A.    City of London's History of Productive Engagement with Funds .........................5

    B.    The Board's Management of the Fund ....................................................................6

    C.    The Fund Repeatedly Delays the 2017 Special Meeting.........................................7

    D.    The Fund and City of London Make Extensive Disclosures in the
           Proxy Campaign......................................................................................................9

    E.    ISS Issues its Recommendation to Vote for City of London's
           Proposals ..............................................................................................................14

    F.    The Fund's Bad Faith Postponement of the March 27, 2018
           Annual Meeting ....................................................................................................15

    G.    City of London Files Suit to Compel a Date Certain for the Annual
           Meeting and Void the Bad Faith Adjournment......................................................16

Argument ...................................................................................................................17

    I    Plaintiffs Have Not Demonstrated a Clear and Substantial
        Likelihood of Success on the Merits......................................................................17

        A.    The Section 14(a) Standard..........................................................................17

        B.    Because City of London Complied with Section 14(a),
            Plaintiffs Cannot Succeed on the Merits of Their Claims .........................19

    II    Plaintiffs Have Not Demonstrated That They Would Suffer
        Irreparable Harm ..................................................................................................24

    III    The Balance of Equities Tips Strongly In Defendants' Favor...............................26

    IV    Plaintiffs Are Not Entitled to Expedited Discovery .............................................27

Conclusion .................................................................................................................29

4570494-1

<u>Table of Authorities</u>

<u>Page</u>

C<small>ASES</small>

*A.X.M.S. Corp. v. Friedman,*
  948 F. Supp. 2d 319 (S.D.N.Y. 2013)..................................................................24

*Ahmad v. Long Is. Univ.,*
  18 F. Supp. 2d 245 (E.D.N.Y. 1998) ...................................................................25

*Allen v. Penn Cent. Co.,*
  350 F. Supp. 697 (E.D. Pa. 1972) .......................................................................27

*Bolger v. First State Financial Services,*
  759 F. Supp. 182 (D. N.J. 1991) .........................................................................25

*Borey v. National Union Fire Ins. Co.,*
  934 F.2d 30 (2d Cir.1991)....................................................................................24

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,*
  866 F. Supp. 2d 223 (S.D.N.Y. 2012)..................................................................19

*Cecere v. County of Nassau,*
  258 F. Supp. 2d 184 (E.D.N.Y. 2003) .................................................................27

*Charming Shoppes, Inc. v. Crescendo Partners II, L.P.,*
  557 F. Supp. 2d 621 (E.D. Pa. 2008) (E.D. Pa. 2008) ........................................19

*Delcath Sys. v. Ladd, Inc.,*
  2006 WL 2708459 (S.D.N.Y. Sept. 20, 2006)....................................................23

*Electronic Specialty Co. v. Int'l Controls Corp.,*
  409 F.2d 937 (2d Cir.1969)..................................................................................23

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
  559 F.3d 110 (2d Cir. 2009).................................................................................24

*Forest City Daly Hous., Inc. v. Town of N. Hempstead,*
  175 F.3d 144 (2d Cir. 1999).................................................................................17

*Free County Ltd. v. Drennen,*
  235 F. Supp. 3d 559 (S.D.N.Y. 2016)..................................................................17

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.,*
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)..................................................................19

Table of Authorities
(continued)

Page

*Hubner v. Mayer,*
    2015 WL 12513581 (C.D. Cal. June 8, 2015) ........................................................25

*Koppel v. 4987 Corp.,*
    167 F.3d 125 (2d Cir. 1999) ..............................................................................18, 19

*Krauth v. Executive Telecard, Ltd.,*
    890 F. Supp. 269 (S.D.N.Y. 1995) .........................................................................26

*Le Sportsac, Inc. v. Dockside Research, Inc.,*
    478 F. Supp. 602 (S.D.N.Y. 1979) .........................................................................25

*Levy v. Young Adult Institute, Inc.,*
    2015 WL 170442 (S.D.N.Y. Jan. 13, 2015) ...........................................................27

*Lewis v. Gen. Employment Enterprises, Inc.,*
    1991 WL 11383 (N.D. Ill. Jan. 21, 1991) ...............................................................23

*Litwin v. OceanFreight, Inc.,*
    865 F. Supp. 2d 385 (S.D.N.Y. 2011) .....................................................................27

*meVC Draper Fisher Jurvetson Fund I, Inc. v. Millenium Partners, L.P.,*
    260 F. Supp. 2d 616 (S.D.N.Y. 2003) .........................................................18, 22, 23

*Mgmt. Assistance Inc. v. Edelman,*
    584 F. Supp. 1021 (S.D.N.Y. 1984) .................................................................26, 27

*N. Atl. Operating Co. v. Evergreen Distributors, LLC,*
    293 F.R.D. 363 (E.D.N.Y. 2013) ............................................................................27

*NACCO Indus., Inc. v. Applica, Inc.,*
    2006 WL 3762090 (N.D. Ohio Dec. 20, 2006) .......................................................25

*Neuromedical Sys., Inc. v. Neopath, Inc.,*
    1998 WL 264845 (S.D.N.Y. May 26, 1998) ...........................................................26

*Notaro v. Koch,*
    95 F.R.D. 403 (S.D.N.Y. 1982) ..............................................................................27

*OBNANCorp. v. Holtzman,*
    956 F. Supp. 250 (N.D.N.Y. 1997) .........................................................................24

*Pantry Pride, Inc. v. Rooney,*
    598 F. Supp. 891 (S.D.N.Y. 1984) .............................................................18, 22, 23, 26

iii

Table of Authorities
(continued)

Page

*Potomac Capital Markets Corp. v. Prudential-Bache*
  *Corporate Dividend Fund, Inc.*,
  726 F. Supp. 87 (S.D.N.Y. 1989) ..................................................................22

*R.R. P.B.A. of State of New York, Inc. v. Metro-N. Commuter R.R.*,
  699 F. Supp. 40 (S.D.N.Y. 1988) ..................................................................26

*Raza v. City of New York*,
  998 F. Supp. 2d 70 (E.D.N.Y. 2013) ..............................................................28

*Roberts v. Atl. Rec. Corp.*,
  892 F. Supp. 83 (S.D.N.Y. 1995) ..................................................................25

*Seibert v. Sperry Rand Corp.*,
  586 F.2d 949 (2d Cir. 1978)..........................................................................18

*Sequa Corp. v. Gelmin*,
  1995 WL 404726 (S.D.N.Y. July 7, 1995) ....................................................25

*Shack v. Reinhard*,
  2008 WL 11337335 (S.D. Cal. Oct. 29, 2008) ..............................................25

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)......................................................................................18

*United Canso Oil & Gas Ltd. v. Clark*,
  497 F. Supp. 111 (S.D.N.Y. 1980) ................................................................24

*Wetter v. Caesars World, Inc.*,
  541 F. Supp. 68 (D.N.J. 1982) ......................................................................26

*Zemel Family Trust v. Philips Int'l Realty Corp.*,
  2000 WL 1772608 (S.D.N.Y. Nov. 30, 2000)................................................18

STATUTES & REGULATIONS

15 U.S.C. § 78n(a) .......................................................................................17

15 U.S.C. § 78u-4(b)(1) ...............................................................................19

15 U.S.C. § 80a-15(a) ..................................................................................24

17 C.F.R. § 240.14a-9 ..................................................................................18

17 C.F.R. § 270.15a-4 .......................................................................... *passim*

iv

Defendants City of London Investment Group PLC, City of London Investment Management Company Limited, Barry M. Olliff, and Emerging Markets Country Fund (collectively, "Defendants"), respectfully submit this memorandum of law in opposition to the motion for temporary restraining order, preliminary injunction, and expedited discovery (the "Motion") by plaintiffs The China Fund, Inc. ("CHN" or the "Fund") and Joe O. Rogers (together with CHN, "Plaintiffs").[1]

### Preliminary Statement

According to current tallies, the stockholders of CHN are voting overwhelmingly to terminate the investment manager that controls its assets and replace two directors with plaintiffs' nominees. In a rare rebuke, the leading independent proxy monitor, Institutional Shareholder Services ("ISS"), has also recommended that the manager be terminated and the new directors nominated by Defendants be installed.  These facts provide compelling evidence of the inferior, and perhaps disastrous, performance of the CHN Board of Directors ("Board") and manager.  CHN and its autocratic chairman, Plaintiff Rogers, now ask this Court to nullify the stockholder vote and holdover the underperforming manager.  According to plaintiffs, the stockholders have been misled because Defendants, who hold approximately 27% of China Fund's shares, have a secret plan to vote against any replacement manager, should the current manager be removed and should a new one be presented.  Plaintiffs' theory rests upon three separate fallacies, each fatal to its claim under Section 14(a) of the Securities Exchange Act of 1934 (the "1934 Act").

---

[1] Plaintiffs' memorandum in support of the Motion is cited as "Mov. Mem."  The Declaration of Barry M. Olliff in opposition to the Motion is cited as "Olliff Decl." and Declaration of Adrienne Ward is cited as "Ward Decl." Those by Joe O. Rogers and Anthony M. Candido in support of the Motion  are cited as "Rogers Decl." and "Candido Decl."

*First*, there is no assurance that a replacement investment manager will ever be presented for stockholder vote. This does not, however, equate to a secret plan to liquidate the Fund. Defendants have also nominated two directors to the Fund's seven-person Board, both of whom are receiving overwhelming stockholder support. City of London has disclosed that these nominees have pledged to encourage their fellow directors to explore all strategic alternatives for The China Fund, including, without limitation, merger, liquidation, the retention of a new manager, and/or a share re-purchase program. After the annual meeting, it is possible that the Board may elect to merge with another fund or vote to liquidate – and shareholders will never be presented with a replacement manager.

*Second*, Plaintiffs contend that Defendants "control" any shareholder vote on a replacement manager, should one occur.  But Defendants hold 27% of the outstanding shares. Should the Board choose a qualified investment manager and should ISS voice its support, there is no reason why 51% of the outstanding shares could not install the new manager.

*Third*, Plaintiffs' theory rests on the premise that Defendants intend to vote against a new manager (should such a vote occur), even against their own financial interests.  Put another way, according to plaintiffs, even if a qualified manager is presented and that manager is the superior alternative for the Fund, Defendants will nonetheless vote to cause a liquidation.  There is no basis offered for this bizarre theory, which presumes that Defendants, who manage approximately $5.3 billion in assets invested in dozens of closed end funds, will act in breach of fiduciary duties owed to their investors.  Plaintiffs' fallacy on this point is accompanied by an out-of-context commentary on a mention by Defendant Olliff, CEO of CLIM, of a theoretical "nuclear option" in regard to Defendants' oversight of its own fund investments.  But the "nuclear option" refers to a shareholder vote on termination of an investment manager, which is

2

cited as a last resort when a board embraces consistent inferior performance, not liquidation. Plaintiffs offer no evidence of any prior forced liquidation by Defendants, who have over 27 years of investing in close-end funds.  The explanation for this omission from plaintiffs' prolix submission is simple: There is none.

Plaintiffs' claim under Section 14(a) of the 1934 Act suffers from two legal defects as well. First, there is no obligation on the part of any proxy participant to discuss plans for voting at future stockholder meetings, which are not scheduled, the agendas of which are unknown, and which may never occur. To require conjecture regarding such events would burden proxy disclosure with discussion of multiple speculative possibilities, without providing any meaningful information to stockholders. It would also leave proxy participants exposed to uncertain and unachievable disclosure obligations.

Second, the total mix of information currently available to the Fund's stockholders includes all the facts that Plaintiffs claim to be a secret. In their own proxy materials, Plaintiffs have touted the consequences that might arise from the termination of the existing investment manager.  The fact that a stockholder vote will be required to install a second manager, and that Defendants have approximately 27% of the voting shares, are well known. Investors may draw their own conclusions from these facts. In contrast to the Board, Defendants' interests are aligned entirely with those of their fellow stockholders, as they receive no fees from board service and are not parties to any arrangements with the investment manager.  For stockholders to conclude that Defendants will vote as they deem prudent and in their own investors' financial interest, on any future matter presented for stockholder consideration, is merely to state the obvious.

No basis exists for this Court to issue the harsh remedy of a temporary restraining order, which would harm stockholders in the extreme and benefit no one but the incumbent Board and its litigious Chairman, Joe O. Rogers.

The real reason for plaintiffs' emergency application is revealed in their request for expedited discovery. To describe this request as a fishing expedition would be unkind to expeditions of that nature, which usually involve some water and some fish. Here, the vindictive losers in a proxy contest propose to burden a stockholder who had the temerity to challenge the Board, with burdensome, expedited discovery. They would do so not at their own expense, but at the expense of CHN stockholders. Thus, Plaintiffs seek discovery of "all documents concerning Your reasons for making and/or supporting the Termination Proposal" as well as any discussion of a "merger, business combination or other strategic alternative including China Fund and any other Person." Plaintiffs even propose to explore Defendants' general investment strategy discussed in an interview in March 2017. Plaintiffs have failed to demonstrate any remote likelihood of success on the merits of their Section 14(a) claim.  The Court should not reward them with extensive, fast track discovery.

The fact that Plaintiffs have acted at the eleventh hour provides an independent ground for denying expedited discovery. This proxy contest began January 31, 2018, when Defendants sent its definitive proxy statements to stockholders. Since then, stockholders have received or sees approximately six press releases, fight letters or other disclosures from Plaintiffs and four from Defendants.  The Annual Meeting was originally scheduled for March 27, 2018.  After apparently losing the vote, Plaintiffs adjourned that date, without explanation, to April 26, 2018. Defendants sought relief in Maryland, CHN's state of incorporation, requiring the annual meeting to take place on a date certain.  Only then, did Plaintiffs file this Motion.  Having

unilaterally added time to the play clock, the Court should not permit Plaintiffs to abuse that extra time by punishing Defendants with discovery.  Rather, the Court should schedule a date for Defendants to file their opposition papers and then hear the pending preliminary injunction motion, either before or after the Annual Meeting on April 26, 2018.

**Statement of Facts**

**A.     City of London's History of Productive Engagement with Funds**

Defendant City of London Investment Group PLC ("CLIG") is an institutional asset manager headquartered in London, England and listed on the London Stock Exchange. Defendant City of London Investment Management Company Limited ("CLIM") is a wholly-owned subsidiary of CLIG, and is the legal entity that provides the investment management service to our clients. (Olliff Decl. ¶2). Defendant Barry Olliff is the founder and Chief Executive Officer of CLIM and the Chief Executive Officer and Chief Investment Officer of CLIG. (*Id.*) Defendant Emerging Markets Country Fund ("EMC") is a private investment fund that is the record holder of 1,000 shares of the Fund; EMC, together with funds and accounts managed by CLIM (collectively, with CLIG and CLIM, "City of London") are currently the beneficial owner of 4,335,711 shares of the Fund, or approximately 27.6% of CHN's outstanding shares. (*Id.* ¶4).

City of London, which was founded in 1991 and currently has over $5.3 billion in funds under management, invests in dozens of U.S.-based closed-end funds. (*Id.* ¶¶2, 6 and Olliff Decl. Ex. 1). It has never made a stockholder proposal to terminate investment advisers that led to the liquidation of the fund. (Olliff Decl. ¶¶10-13).[2]  To the contrary, City of London works to

---

[2] Plaintiffs misrepresent the facts surrounding City of London's investment in the JP Morgan China Region Fund ("JFC"), implying that City of London's proposal to terminate the investment manager led to JFC's liquidation. (Mov. Mem. at 12). There, another stockholder first proposed that JFC be liquidated entirely, and City of London voted against the proposal. (Olliff Decl. ¶13; Olliff Decl. Ex. 3).  Only after that proposal fell through, as well as the

5

proactively engage with funds to address performance issues and has published guidance on corporate governance, which it distributes to all board members of the closed-end funds in which it has invested. (Olliff Decl. ¶8; Olliff Decl. Ex. 2). During the presentation cited by Plaintiffs regarding City of London's investment strategies overall, Olliff described a proposal to terminate an investment manager (not a proposal to liquidate as Plaintiffs repeatedly suggest, Mov. Mem. at 27, 30), as the "nuclear option" as a negotiating technique when all else has failed.[3] (Olliff Decl. ¶8). Such regular engagement is important for closed-end funds, as the dynamics of the market for their shares means that prolonged underperformance makes share price realignment nearly impossible. (*Id.* ¶¶5-10).

## B. The Board's Management of the Fund

The Fund is a non-diversified, closed-end registered investment company that invests in China-based entities or entities which derive a significant portion of their revenue from the People's Republic of China. Complaint ¶27. Rogers is Chairman of the Board and has served as a director since the Fund's inception in 1992. (Rogers Decl. ¶1).

City of London has been a stockholder of the Fund since 2007. (Olliff Decl. ¶7). As of February 2, 2018, City of London was the beneficial owner of 4,229,534 shares of CHN common stock, or 26.9% of the shares then-outstanding.[4] (Candido Decl. Ex. 8 at 20).

The Fund has a staggered board of directors (the "Board") divided into three classes, with directors elected to three year terms with one class coming up for election each year. (*See* Candido Decl. Ex. 9 at 8-9). Rogers is up for re-election at the 2018 annual meeting of stockholders along with director Richard Shore. The Fund's day-to-day operations are managed

---

board discussions to merge JFC with another fund, did City of London announce an intention to propose to terminate the investment manager.  (Olliff Decl. ¶13).
[3] This presentation was also not delivered in the context of a CHN proxy campaign.
[4] As disclosed on April 3, 2018, City of London is currently the beneficial owner of 4,335,711 shares of CHN common stock, reflecting 27.6% of shares outstanding. (Ward Decl. Ex. 15).

by an investment manager, Allianz Global Investors U.S. LLC ("Allianz"). (*See* Rogers Decl. Ex. 1 at 7).

Pursuant to Sections 15 and 16 of the Investment Company Act (ICA), director elections and approval of investment manager contracts are the only two items on which stockholders have a say under the ICA.   *See* Sections 15 and 16 of the ICA, 15 U.S.C. §§ 80a-15(a), 16. If stockholders vote to terminate the Fund's investment adviser's contract, such termination is not effective for 60 days. (Rogers Decl. ¶7). Further, in the event that the Fund's investment advisory contract is terminated, an interim investment adviser can be appointed after the termination of a previous investment advisory contract, provided that*, inter alia*, the fund's board has approved the interim contract within 10 business days.   17 U.S.C. § 270.15a-4(b)(1)(ii). Stockholder approval of the interim advisory contract is not required. In other words, the Board will have at least 70 days from the day of the CHN annual meeting (if it ever occurs) to identify an interim adviser and approve its interim contract. The interim investment adviser can serve in such capacity for 150 days. 17 U.S.C. § 270.15a-4(a)(2).

### C.     The Fund Repeatedly Delays the 2017 Special Meeting

During the last seven years, City of London has sought to address a number of critical issues affecting the Fund directly with the Board.  (Olliff Decl. ¶¶14-15). On January 18, 2017, City of London wrote CHN, expressing concern about Allianz's performance. (*Id.* ¶16). On February 3, 2017, Rogers wrote back defending Allianz. (*Id.* ¶17).

On March 31, 2017, the Fund abruptly announced the Board's proposal to replace Allianz with a new investment manager, Open Door Investment Management, Ltd. ("Open Door"). (*Id.* ¶17). The Fund initially scheduled a special meeting of CHN stockholders for June 20, 2017, to vote on the proposal. (*Id.* ¶20).

Open Door's appointment alarmed City of London, and raised troubling doubts about the Board's oversight, because the portfolio manager at Open Door had been involved in conduct harmful to the Fund that led the Fund's former investment manager, Martin Currie Investment Management Limited, and lead portfolio manager, Chris Ruffle, to be fined approximately $10,000,000 by the SEC and the United Kingdom securities regulator, the Financial Services Authority ("FSA").  (Olliff Decl. ¶18; Olliff Decl. Exs. 5-7). On information and belief, the SEC releases refer to Shifeng Ke, who would serve as the new portfolio manager, were Open Door to be hired, had worked closely with Ruffle at Martin Currie as "PM-2". (Olliff. Decl. ¶18).

In response, City of London wrote Rogers, questioning the propriety of hiring Open Door, as Open Door's principals were central to SEC and FSA proceedings during their previous tenure as the Fund's investment manager and that it would vote against the proposal. (*See, e.g.*, Candido Decl. Exs. 3, 4). On August 10, 2017, City of London wrote that it would submit a Rule 14a-8 proposal to terminate the investment management contract with Allianz prior to the deadline of September 21, 2017, the date for stockholders to make Rule 14a-8 proposals for stockholder vote at the next annual meeting, "if Open Door were selected." (Candido Decl. Ex. 3). The letter also expressed City of London's opinion, as did a letter sent September 11, 2017, that the Fund would have "no future" if the Board continued on the path of appointing a manager like Open Door.  (*Id.*; Candido Decl. Ex. 4).

Although the Fund adjourned the special meeting several times to garner the requisite votes to attempt to install Open Door, the special meeting was finally held on August 30, 2017, and the Fund failed to obtain the requisite votes to approve Open Door's hiring. (Olliff Decl. ¶¶20-21).

### D.     The Fund and City of London Make Extensive Disclosures in the Proxy Campaign

On December 29, 2017, City of London delivered notice of (a) its intent to nominate Julian Reid and Richard A. Silver for election to the CHN Board at the 2018 annual meeting of CHN stockholders (the "City of London Nominees") and (b) its proposal to terminate Allianz's contract. (Olliff Decl. ¶23).

On January 8, 2018, CHN announced that its 2018 annual meeting of stockholders would be held on March 27, 2018, with stockholders of record as of February 2, 2018, entitled to notice of, and to attend and vote at, the meeting. (*Id*. ¶24). Accordingly, on January 17, 2018, City of London filed a preliminary proxy statement with the SEC, containing proposals to elect the City of London Nominees and terminate Allianz. (*Id.* ¶25). This proxy statement summarized why City of London believed the Board had failed to act in the best interests of stockholders based on, *inter alia*, the following points:

- **Exercise of Poor Judgment:** Board Failed in its Aggressive Attempts to Install an Investment Adviser Whose Principal was Sanctioned by the SEC for Wrongdoing as the Fund's Previous Portfolio Manager

- **Poor Investment Performance:** Board is Attempting to Protect a Manager They Tried to Fire Last Summer, Who Has Poor NAV Performance vs. the Benchmark Index

- **Shareholders Deserve a New Direction:** City of London's Highly Qualified Nominees are Committed to Exploring ALL Opportunities to Maximize Value for Stockholders

(Olliff Decl. Ex. 8 at 1). Furthermore, City of London disclosed in the proxy statement that the City of London Nominees would be "committed to evaluating all strategic alternatives to … return value to the Fund's stockholders including, among others, by reinstating the share buyback program discontinued by the Board in March 2013, liquidating the Fund, or seeking the consolidation of the Fund with one or more other closed-end funds focused on the emerging

9

markets." (*Id.* at 4). The materials continue, providing further detail regarding the potential merits of a potential consolidation with other closed-end funds, stating that this strategy, "among all other alternatives," should be considered. (*Id.*) City of London thus fully disclosed that, once the Board was at a juncture to actually put forth a proposed strategic alternative to improve the Fund's performance, it would be able to evaluate it.

With respect to the Board election, the City of London proxy materials solicited votes in order to elect its proposed nominees, Julian Reid and Richard A. Silver. Each nominee has substantial relevant experience, including experience while serving on the board of directors of another closed-end fund, with restructuring and selecting an investment manager. (*Id.* at 7; *see also* Olliff Decl. ¶23).

The Fund filed its preliminary proxy statement on January 23, 2018, and immediately began declaring to CHN stockholders that it believed City of London had a "preference for liquidation" and a "plan to force the Fund to cease operations and liquidate." (Candido Decl. Ex. 6 at Cover Letter and 1). Instead of disclosing that the Board can appoint an interim investment adviser in the event Allianz's contract is terminated, the Fund stated that it "would be incapable of operating" after 60 days. In the Fund's preliminary proxy statement, the Board also expressed its belief that City of London may be trying to force a liquidation, force a merger with another fund, or, perhaps, "some other plan." (Ex. 6 at 2). The Fund's preliminary proxy statement attempts to explain why termination would "likely lead" to liquidation, stating:

> It is clear from [City of London's] correspondence with the Fund that the purpose of [City of London's] proposal is to force liquidation of the Fund. If Proposal 2 is approved the Fund would be required to provide **60 days' notice of termination** to the Adviser. **The Board would then need to put in place new investment advisory agreements with the Adviser or another investment adviser.** Under the 1940 Act, any new advisory agreements **could continue in effect for only 150 days** without stockholder approval. Any such approval would require a favorable vote by a majority of the Fund's outstanding voting securities (as

4570494-1

> defined in the 1940 Act). For these purposes, as required by the 1940 Act, the vote of a "majority" of the Fund's outstanding voting securities means the affirmative vote of (a) 67% or more of the shares of the Fund's common stock present at a meeting, if the holders of more than 50% of the outstanding shares are present or represented by proxy or (b) more than 50% of the outstanding shares of the Fund, whichever is less. The Board believes it highly unlikely that such a vote could be obtained, particularly in the face of opposition by [City of London] and other stockholders that support [City of London's] proposal.

(Candido Decl. Ex. 6 at 16 (emphasis added)). The Fund's proxy materials go on to admit that replacing Allianz would only be "very difficult and time-consuming," but not impossible. (*Id.*) Nonetheless, the Board stated that if Allianz is terminated, it would:

> carefully evaluate the situation at the time and take all appropriate actions to act in the best interests of the Fund and its stockholders under the circumstances. *If* the Fund is unable to secure the services of a suitable investment adviser or cannot obtain stockholder approval of new investment advisory agreements, it *may* become in the best interests of the Fund's stockholders to liquidate the Fund.

(*Id.*) (emphasis added). In other words, the Board intended to work to maximize stockholder value by any appropriate means, just as City of London's Nominees intend to do, and recognized that liquidation was not a *fait accompli* upon termination.

City of London filed its definitive proxy statement on January 31, 2018, whereby it, among other things, added the following disclosure to explain that the proposal to terminate Allianz does not equate to, or necessarily lead to, a liquidation:

> ### Termination of the Investment Manager is
> ### Not as Dire as the Board Depicts

> It is the Board's duty to assess the Fund's investment manager. If Allianz is terminated, the Board must simply do its job and find another manager. **The Fund can hire an interim manager, including Allianz, to manage the Fund until it can find a suitable replacement, for up to 150 days.** As the Fund's largest stockholder we are confident our investment will not be put at risk and the Board, by acting reasonably and in the best interests of stockholders, **will be able to find a superior investment manager to replace Allianz**. The Board's alarmist claims of the risk that the Fund will be without an investment manager are greatly overblown, as is their hyperbole about what City of London's undisclosed intentions are with respect to the Fund. Our goal is simple - **to elect a Board that is committed to maximizing value for its stockholders after**

> **carefully reviewing *all strategic alternatives***. We are confident that our Nominees, if elected, will be able to identify outstanding replacement investment managers to the other members of the Board for their consideration, and a responsible Board, exercising their fiduciary obligations should be able to prevent a situation where the Fund does not have an investment manager.

(Olliff Decl. Ex. 9 at 5) (emphases added).[5]

In addition, City of London provided further detail on strategic alternatives it hoped the reconstituted Board to consider:

> City of London believes the Fund's stockholders would find the opportunity to realize the NAV of their Shares an attractive option given the wide NAV discount and the Shares' underperformance relative to the Fund's Benchmark. Our Nominees, if elected, will constitute a minority of the Board and cannot guarantee the cooperation of the remaining members of the Board with respect to charting a path forward for the Fund, however, the Nominees intend to work constructively with the other members of the Board to discharge their duties as directors of the Fund in compliance with all applicable legal requirements, including the general fiduciary obligations imposed upon corporate directors. If elected, the Nominees will use their best efforts to cause the Board to evaluate all strategic alternatives to reduce the discount in the Shares or to otherwise return value to the Fund's stockholders including, among others, by reinstating the share buyback program discontinued by the Board in March 2013, liquidating the Fund, or seeking the consolidation of the Fund with one or more other closed-end funds focused on the emerging markets.

> With respect to a potential consolidation of the Fund, our Nominees, if elected, and based on all of the information available to them as members of the Board, would consider whether a consolidation of the Fund with one or more other closed-end funds, including a consolidation conditioned upon a tender offer by the combined fund allowing stockholders in the combined fund to sell their shares at a price close to the combined fund's NAV, would be in the best interests of the Fund's stockholders. A similarly structured consolidation is currently awaiting approval by the stockholders of Aberdeen Chile Fund, Inc., and other Aberdeen closed-end funds, of which City of London is a stockholder. We believe the Fund's stockholders deserve a Board that is willing to independently evaluate the benefit such a transaction, among all others alternatives, would provide to the Fund's stockholders.

*(Id.* at 7).

---

[5] The definitive proxy statement also included an additional discussion that the City of London's Nominees, "if elected, will constitute a minority of the Board and cannot guarantee the cooperation of the remaining members of the Board with respect to charting a path forward for the Fund, however, the Nominees intend to work constructively with the other members of the Board to discharge their duties . . . . If elected, the Nominees will use their best efforts to cause the Board to evaluate all strategic alternatives . . . ." *(Id.* at 7).

The Fund filed its definitive proxy statement on February 5, 2018. (Candido Decl. Ex. 9). Although the Fund's Motion would suggest that it remained silent in response to City of London's further proxy solicitations and purported misleading statements therein, the Fund made seven subsequent filings in advance of the March 27, 2018 annual meeting date. (*See* Ward Decl. Exs. 3, 5, 7, 9, 10; Olliff Decl. Exs. 10, 11). These included direct responses to City of London's proxy materials, and put stockholders on notice that the Fund allegedly felt City of London was "lying" and undertaking a "back-door ploy to liquidate the Fund." (Olliff Decl. Ex. 10 (2/5/18 additional proxy materials) at 4); *see also id.* Ex. 11 (2/26/18 additional proxy materials) ("City of London has publicly announced it wants to force the Fund to liquidate as soon as possible. The dissidents' Termination Proposal and related proposal to elect two dissident directors seem designed to force the Fund to liquidate."); Ward Decl. Ex. 3 (3/6/18 additional proxy materials) (stating the "Fund knows City of London wants it to liquidate" and accusing City of London of "misleadingly conceal[ing] its desire" to force liquidation); *id.* Ex. 5 (3/9/18 additional proxy materials) (describing how City of London's proposals "*could* force the Fund to liquidate or merge with other funds that have different objectives from ours") (emphasis added)).

In response to these filings, City of London made even further disclosures, including explaining that "[i]f Allianz is terminated, the Board can hire an interim Manager for up to 150 days, which we believe would provide adequate time for the Board to find a suitable replacement." (Ward Decl. Ex. 4 (3/7/18 materials) at 19). City of London further clarified that its Nominees had deep experience in *replacing* a closed-end fund's investment adviser, and that this experience would be transferrable to the Fund's Board. (Candido Decl. Ex. 11 (3/12/18 materials) at 4). City of London further explained that its Nominees "have a plan to find a

qualified manager" based on a number of factors, which the full Board could consider should Allianz be terminated. (*Id.* at 5).

On March 14, 2018, City of London made clear that the Fund was the one that was being misleading. In the additional proxy materials filed on March 14, 2018, City of London implored stockholders:

> ### DO NOT BE MISLED BY THE CHINA FUND'S FALSE CLAIMS
>
> …
>
> **WE ARE NOT PROPOSING LIQUIDATION** – The Board is misleading you by saying that we plan to liquidate CHN. What we ARE proposing is to terminate the Fund's Manager, Allianz . . . . Firing Allianz will not liquidate the Fund.

(Candido Decl. Ex. 12 at 3) (emphasis in original).

### E.  ISS Issues its Recommendation to Vote for City of London's Proposals

The Fund and City of London each made presentations to Institutional Shareholder Services, Inc. ("ISS")—which is widely recognized as the leading independent voting and corporate governance advisory firm, with its analysis and recommendations relied on by major institutional investment firms, mutual funds and fiduciaries throughout the world—and filed their presentations with the SEC. (Ward Decl. Exs. 4, 7; Rogers Decl. Ex. 10; Candido Decl. Ex. 11). After undertaking "multiple reviews" of its report with respect to the CHN stockholder proposals, ISS issued recommendations on March 16, 2018 to vote "For" City of London's Nominees, and "For" City of London's proposal terminating Allianz as CHN's investment advisor. (*See* Rogers Decl. Ex. 4).

ISS acknowledged that the Fund suffered from years of underperformance, and that the Board failed to engage an investment advisor that the requisite number of CHN stockholders could support. (*Id.* at 9-10). ISS also acknowledged that the Board could act should Allianz's contract be terminated, stating:

> As for the termination of Allianz, the concerns raised by the board relative to the potential disruption and liquidation of the fund amount to an argument that if, following approval of the dissident's proposal (and therefore the possible termination of Allianz), the board takes no additional action - and thus fails to select a new advisor - shareholders might face outcomes such as leaving the fund orphaned without an investment advisor, disrupting the fund's investment process, as well as liquidating the fund. Some of these issues appear to be true; it also, however, appears to be utterly within the board's control to eliminate this risk, literally by identifying a new advisor.

(*Id.* at 10). In addition, ISS endorsed terminating Allianz and found City of London's Nominees to be "valuable additions" to the Fund's Board. (*Id.* at 11). City of London summarized ISS's recommendations in a letter to stockholders dated March 19, 2018. (Candido Decl. Ex. 13).

According to the Fund's own estimations, by the morning of March 19, 2018, the termination proposal was supported by 83.78% of the votes cast, meaning the proposal was likely to pass. (*See* Rogers Decl. Ex. 6). The Fund's director nominees, meanwhile, were on track to be voted out by a 3-to-1 margin. (*Id.*) The vote results got even worse by the afternoon. (*See id.* Ex. 7 (indicating 83.42% of votes cast supported the termination proposal, and City of London's nominees had over 81% of the votes cast to date)).

Faced with the harsh reality that the leading shareholder advisory firm—and now, their own stockholders—sided against them, the Board sought to have ISS change its recommendations, but ISS declined to do so. (*See* Rogers Decl. Ex. 9).

### F.    The Fund's Bad Faith Postponement of the March 27, 2018 Annual Meeting

In the days leading up to the annual meeting scheduled for March 27, 2018, it became clear that the termination proposal would pass. (Compl. ¶71; Rogers Decl. ¶19; Candido Decl. Ex. 20 (Ferguson Decl.) ¶13). The termination proposal and City of London's nominees were on track to be elected by more than a 2-to-1 margin. (Candido Decl. Ex. 20 (Ferguson Decl.) ¶13b-c). On Friday, March 23, 2018, the Fund issued a press release announcing that the Board

postponed the 2018 Annual Meeting to April 26, 2018, giving no explanation. (Ward Decl. Ex. 10).

### G.    City of London Files Suit to Compel a Date Certain for the Annual Meeting and Void the Bad Faith Adjournment

City of London issued (and filed with the SEC) a press release setting forth its view that the Board's postponement of the annual meeting was improper. (Ward Decl. Ex. 11). At no point prior to the filing of the Complaint in this action did the Fund or the Board provide any justification or explanation for the meeting's postponement.

On March 29, 2018, City of London filed suit in the Circuit Court for Baltimore County, Maryland, Case No. 03-C-18-3252, against the Fund and the Board. (Candido Decl. Ex. 16) ("Maryland Action"). In the Maryland Action, City of London is seeking a declaration and injunctive relief from the Court declaring that China Fund must conduct the annual meeting on April 26, 2018, and enjoining China Fund from any further adjournments; an order declaring that the votes taken by proxy as of March 27, 2018, the date the annual meeting was originally scheduled for, constituted a quorum for purposes of the annual meeting and that the vote as of March 27, 2018 should be certified; and an order declaring that the last-minute postponement of the annual meeting by the Fund's Board was an improper entrenchment device in violation of its bylaws and constituted a breach of the directors' statutory and common law duties. City of London also sought injunctive relief, pursuant to a motion filed March 30, 2018, seeking an order from the Court that the annual meeting proceed as scheduled on April 26, 2018. On April 3, 2018, the Circuit Court for Baltimore County granted City of London's motion to shorten time in the Maryland Action, with the Fund to file a response to City of London's preliminary injunction motion by April 6, 2018, after which the clerk will schedule a hearing on the

16

preliminary injunction motion for the earliest practicable date before April 26, 2018. (Ward Decl. ¶ 17).

Facing insurmountable rejection by shareholders of the Board's proposals and opposition to the termination proposal and the Maryland Action, Plaintiffs filed this case on April 2, 2018, almost exactly three months after the Fund had claimed City of London was lying about its intent to liquidate the Fund.

## Argument

**I**   **Plaintiffs Have Not Demonstrated a Clear and Substantial Likelihood of Success on the Merits**

A party seeking a temporary restraining order "must typically show four elements: (1) a likelihood of success on the ultimate merits of the lawsuit; (2) a likelihood that the moving party will suffer irreparable harm if a TRO is not granted; (3) that the balance of the hardships tips in the moving party's favor; and (4) that the public interest is not disserved by the relief granted." *Free County Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). Further, it is well settled that "[a]n even more rigorous standard – requiring a clear or substantial showing of likelihood of success – applies where (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149-50 (2d Cir. 1999) (citation omitted).

### A.   **The Section 14(a) Standard**

Section 14(a) of the Exchange Act makes it "unlawful for any person . . . in contravention of such rules and regulations as the [SEC] may prescribe . . . to solicit any proxy or consent or authorization in respect of any security . . . ." 15 U.S.C. § 78n(a). Pursuant to Section 14(a), the SEC promulgated Rule 14a-9, which provides:

4570494-1

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . .

17 C.F.R. § 240.14a-9.

A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see also meVC Draper Fisher Jurvetson Fund I, Inc. v. Millenium Partners, L.P.*, 260 F. Supp. 2d 616, 634 (S.D.N.Y. 2003) ( "It is not sufficient to allege that the investor *might* have considered the misrepresentation or omission important.") (emphasis added). A plaintiff asserting a material omission must demonstrate that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* Moreover, "[a]lthough the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (internal quotations omitted).

Underlying "the policy behind the 'total mix' approach" is the conviction that "the purpose of looking at the sum of all information reasonably available is to enable a registrant to rely on a reasonable belief that the other party already has access to the facts [to] excuse him from new disclosures which reasonably appear to be repetitive." *Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999); *Zemel Family Trust v. Philips Int'l Realty Corp.*, 2000 WL 1772608, at *3 (S.D.N.Y. Nov. 30, 2000) (denying plaintiff's motion for preliminary injunctive relief and holding that "[i]n assessing the materiality of an omission, a court must determine whether disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the total mix of information made available") (citations and quotations omitted); *Pantry Pride, Inc. v. Rooney*, 598 F. Supp. 891, 901-02 (S.D.N.Y. 1984).

Thus, there is "no reason to require" amendments to proxy filings when "the disputed information is already available to shareholders through the parties' SEC filings," or when the allegedly omitted information is the voting process mandated by the Investment Company Act itself. *Charming Shoppes, Inc. v. Crescendo Partners II, L.P.*, 557 F. Supp. 2d 621, 628 (E.D. Pa. 2008) (E.D. Pa. 2008). In short, in assessing Plaintiffs' Rule 14a-9 allegations, this Court must consider not only the disclosures made by Defendants' proxy materials, but rather must also consider the "total mix" of information released in *all* disclosures. *See Koppel*, 167 F.3d at 132.

Finally, as Plaintiffs allege that Defendants' statements are instances of "fraud and deception" (Compl. ¶ 82), their claims are subject to the heightened pleading requirements of Rule 9(b). *See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 239 (S.D.N.Y. 2012) ("When a plaintiff's factual assertions in a Section 14(a) claim are premised on fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory."); *see also Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017) (noting that "courts have generally concluded that Section 14(a) allegations must identify with precision any misleading statements or omitted material facts pursuant to the PLSRA, 15 U.S.C. § 78u-4(b)(1)").]

B.  **Because City of London Complied with Section 14(a), Plaintiffs Cannot Succeed on the Merits of Their Claims**

Plaintiffs allege that City of London's proxy materials are false and misleading because they:

- create[] the false impression that stockholder approval is not required to appoint an investment adviser (i.e., that the Board alone has the power to appoint a new investment adviser);

- create[] the false impression that Defendants are open to and will not oppose the appointment of an investment adviser;

- create[] the false impression that Defendants do not by themselves have the voting power to effectively prevent the appointment of a new adviser;

- create[] the false impression that Defendants do not seek to accomplish a liquidation, through the "nuclear option" or otherwise;

- omit[] to disclose Defendants' true intentions with respect to the Fund, *i.e.,* to liquidate the Fund (or undertake some other transaction to its benefit such as a consolidation with other funds in which City of London holds a large position).

(Compl. ¶ 86). These allegations, however, are contradicted by the plain language in the proxy materials and the uncontroverted facts regarding the Fund. Shareholders have not been denied any information that is substantially likely to alter the total mix of information made available.

First, the total mix of information repeatedly discloses and explains what approval is necessary in order to appoint a new investment adviser. In the Fund's preliminary proxy statement, the replacement process is described in detail, with the Fund explaining that the Fund would be required to provide a notice of termination to Allianz within sixty days of the vote, after which the Board would be able to put in place a new investment advisory agreement, which could be in effect on an interim basis for 150 days without stockholder approval. (*See* Candido Decl. Ex. 6 at 16). City of London's proxy materials further clarify that the interim manager could even be Allianz. (Olliff Decl. Ex. 10 at 5). These disclosures are consistent with the requirements set forth in the ICA and SEC regulations.[6] 17 U.S.C. § 270.15a-4(b)(1); Rule 15a-4, 17 C.F.R. §270.15a-4.

---

[6] Moreover, the Fund repeatedly and consistently responded to the alleged misleading disclosures by City of London, thus altering the total mix such that stockholders were fully informed. If the Fund genuinely believed that

Second, City of London does not have veto power over any stockholder vote to approve an investment adviser, and stockholders are fully informed regarding the statutory thresholds required to do so. City of London's proxy materials state in full, under the heading "**VOTES REQUIRED FOR APPROVAL**":

> *Proposal to Terminate Investment Adviser* – The approval of Proposal 2 requires the affirmative vote of a majority of the outstanding voting securities of the Fund. The vote of a majority of the outstanding voting securities is defined in the Investment Company Act of 1940 as the lesser of the vote of (i) 67% or more of the shares of the Fund entitled to vote thereon present at the meeting if the holders of more than 50% of such outstanding shares are present in person or represented by proxy or (ii) more than 50% of such outstanding shares of the Fund entitled to vote thereon.

(Candido Decl. Ex. 7 at 15) (emphases in original). Further, City of London fully disclosed its share holdings, both in its proxy materials and in amended Schedules 13D filed before and during the proxy campaign. (*See, e.g.*, Olliff Decl. Ex. 9 at 1, Ex.10 at 2). Plaintiffs do not allege that its stockholders cannot grasp the simple math that a holder of 27% of stock cannot prevent 51% of stockholders from casting their vote as they please. Instead, Plaintiffs insist that voter turnout should be "frozen" at 70% to change the math. (*See, e.g.*, Compl. ¶ 49). By their own math, City of London does not hold an actual veto over the termination proposal. (*See* Mov. Mem. at 14). More to the point, the Fund's stockholders were fully informed of Plaintiffs' belief that City of London's vote would have an outsized impact on the chances of success of any vote on the Fund's investment manager. (*See, e.g.*, Candido Decl. Ex. 6 at 16 ("The Board believes it highly unlikely that such a vote could be obtained, particularly in the face of opposition by [City of London] and other stockholders that support [City of London's] proposal.") Indeed, in describing why it believes that City of London held an effective veto power, the Fund concedes

---

City of London's disclosures were misleading at the time (at a time prior to losing the vote, or being forced to account their breaches of the Board's duties pursuant to Maryland law and/or the Fund's By-Laws in connection with City of London's suit in Maryland), it had every opportunity to further inform stockholders. The Fund, in fact, did just that, repeatedly providing additional proxy materials on this very issue.

that "[a]ll of this information is in the China Fund's proxy materials on file with the SEC." (Ward Decl. Ex. 9 at 2). Investors are fully informed regarding the statutory voting requirements and City of London's holdings; it is time to let their votes be counted.[7]

Third, City of London is under no obligation to disclose its stance on a series of hypotheticals, as Plaintiffs demand, faulting City of London for failing to disclose whether it will vote for, or not oppose, the appointment of a yet-to-be-identified replacement adviser. Plaintiffs cite no precedent to support a duty to respond to such hypotheticals (*see* Mov. Mem. 27-30), because this is not the law. City of London has disclosed that its goal is to "to elect a Board that is committed to maximizing value for its stockholders after carefully reviewing all strategic alternatives." (Candido Decl. Ex. 7 at 5). Defendants are not required to provide any more detailed strategy for their plans, should they succeed in their proxy solicitation. *See meVC Draper Fisher Jurvertson I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp.2d 616, 635 (S.D.N.Y. 2003); *Pantry Pride, Inc. v. Rooney*, 598 F. Supp. 891, 901 (S.D.N.Y. 1984) (no requirement to speculate on actions that reporting person will take if successful in proxy solicitation). *Potomac Capital Markets Corp. v. Prudential-Bache Corporate Dividend Fund, Inc.*, 726 F. Supp. 87, 91 (S.D.N.Y. 1989) ("Defendants cannot be required in their proxy statement to address how a power might be used under every possible future circumstance."). Plaintiffs have not put forward any proposal upon which City of London could have a view and instead target their imaginings of City of London's intentions without ever putting forth the Board's plan to address stockholders' concerns. City of London cannot disclose what it may think on a plan that does not yet exist. "To require defendants to confirm what are only speculative options would be as egregious as pretending that they did not exist: It would be as

---

[7] For this same reason, Plaintiffs' assertion that the proxy solicitations are an "essential link" in the termination of Allianz is incorrect and speculative. (*See* Mov. Mem. at 31-32).

serious an infringement of SEC regulations to overstate the definiteness of the plans as to understate them." *Pantry Pride*, 598 F. Supp. at 901 (quoting *Electronic Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir.1969).

To the extent that Plaintiffs argue that Defendants have *already* decided that liquidation of the Fund was the only viable option, the Fund "has not put forth sufficient evidence of any concealed decision to do so." *meVC Draper Fisher Jurvertson Fund*, 260 F. Supp. 2d at 635-36. At best, Plaintiffs point to stray statements from a discussion in March 2017 that has nothing to do with CHN and entirely mischaracterized statements City of London made when the Fund advocated for Open Door's hiring as investment manager. (*See* Mov. Mem. at 28-29; *cf.* Olliff Decl. ¶¶9-13, 18-20). *Pantry Pride*, 598 F. Supp. at 901 ("The same principles of free speech, free analysis and free criticism apply to corporate elections as apply to the political forum. The Court will not use section 14(b) to squash legitimate differences of opinion."). There is no disclosure obligation about a meeting that has yet to be scheduled on a topic that has yet to be proposed (*i.e.*, would the Board propose a merger, liquidation, self-tender, or a new adviser?).

The Fund has repeatedly, since February 5, 2018, provided shareholders with its views, as has City of London and ISS. The stockholders have the necessary facts and each side's spin. There is no reason for this Court to intercede, because Plaintiffs have failed to show they are likely to succeed on the merits of their claims.[8]

---

[8] The two cases upon which Plaintiffs rely involve circumstances of specific failures to disclose identifiable non-speculative information. In *Delcath Sys. v. Ladd, Inc.*, 2006 WL 2708459, at *4 (S.D.N.Y. Sept. 20, 2006), the valuation firm's lack of independence was not disclosed, and prior financial and accounting failures of companies on which the nominee had served on the board was not disclosed. In *Lewis v. Gen. Employment Enterprises, Inc.*, 1991 WL 11383, at *2 (N.D. Ill. Jan. 21, 1991), the Court found that a proxy statement's description of an issue as "unsettled" under state law to be misleading, as the state court had decided the issue such that it was "not unsettled at all." No such similar misstatements are alleged by Plaintiffs, which are instead based on Plaintiffs' self-serving conjectures and mischaracterizations.

**II**      **Plaintiffs Have Not Demonstrated That They Would Suffer Irreparable Harm**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). An injury "alleged to be irreparable must be actual and imminent, not merely possible." *A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 336 (S.D.N.Y. 2013); *see also Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir. 1991) (The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction."). "Courts are understandably reluctant to interfere with an ongoing proxy solicitation absent the clearest showing of irreparable harm . . ." *United Canso Oil & Gas Ltd. v. Clark*, 497 F. Supp. 111, 115 (S.D.N.Y. 1980). Indeed, a moving party "cannot prove irreparable harm merely by showing a material false solicitation." *OBNANCorp. v. Holtzman*, 956 F. Supp. 250, 256 (N.D.N.Y. 1997).

This is not a scenario where the Court cannot "unscramble the eggs" as Plaintiffs suggest, requiring emergency relief. (Mov. Mem. at 32). Should the termination proposal be approved by the Fund's stockholders at the to-be-held annual meeting, the ICA and rules thereunder provide for an orderly procedure by which the Board has 60 days to provide notice to Allianz, after which *the Board* has 10 business days to appoint an interim manager who can then serve for 150 days, during which time stockholders can vote to approve a new management contract. 17 C.F.R. § 270.15a-4. The result of this stockholder vote is therefore not "irreversible" as Plaintiffs aver, and the harm identified by Plaintiffs is speculative. (Mov. Mem. at 33). Moreover, the ICA requires that stockholders approve the investment manager's contract.  15 U.S.C. § 80a-15(a). These provisions are at odds with Plaintiffs' claim that termination of Allianz equates to a liquidation of the Fund.

24

In addition, Plaintiffs cannot claim they will suffer irreparable harm, as they have unnecessarily delayed in seeking this Court's relief. Defendants filed their first preliminary proxy statement on January 17, 2018. (Olliff Decl. Ex. 8). Since that time in advance of the original annual meeting date, Defendants have filed additional materials on January 29, January 31, February 1, March 7, March 12 (twice), March 14, and March 19. The Fund has filed proxy materials on January 23, February 5 (twice), February 26, March 6, March 9, March 14, March 20, and March 23, prior to the postponement. Further materials followed the postponement. Plaintiffs, however, did not seek relief until after these filings, until several weeks after the vote was—as Plaintiffs concede—leading to a defeat, and after City of London sought relief in Maryland state court. Under these circumstances, courts routinely discredit a plaintiff's claim of irreparable harm on account of their delay in seeking relief. *See Shack v. Reinhard*, 2008 WL 11337335, at *3 (S.D. Cal. Oct. 29, 2008) (denying plaintiffs' request for preliminary injunction regarding a proxy campaign due to delay in seeking judicial action); *Hubner v. Mayer*, 2015 WL 12513581, at *7 (C.D. Cal. June 8, 2015) (same); *NACCO Indus., Inc. v. Applica, Inc.*, 2006 WL 3762090, at *8 (N.D. Ohio Dec. 20, 2006) (same).[9]

Moreover, there is no irreparable harm because, in the event the Court finds a disclosure violation, this Court "may void elections which were not based on fair disclosure and order new elections to be held." *Bolger v. First State Financial Services*, 759 F. Supp. 182, 191 (D. N.J.

---

[9] *Accord Roberts v. Atl. Rec. Corp.*, 892 F. Supp. 83, 87 (S.D.N.Y. 1995) (noting that "injunctive relief is premised on the need for quick action to preserve a party's rights and delay in enforcing those rights indicates a reduced need for such extreme action"); *Ahmad v. Long Is. Univ.*, 18 F. Supp. 2d 245, 249 (E.D.N.Y. 1998) ("The Second Circuit has observed that preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action .... Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."); *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979) ("Although plaintiff contends that it will be irreparably harmed should defendants' activities not be enjoined, it has waited nearly a year before seeking any relief. Delay of this nature undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."). As explained in *Sequa Corp. v. Gelmin*, 1995 WL 404726, at *9 n.7 (S.D.N.Y. July 7, 1995), this line of cases should not be "confined to trademark or related claims."

1991) (finding no irreparable harm and denying preliminary injunction); *Pantry Pride*, 598 F. Supp. at 899 (same, because "the Court has the power, if defendants' proxies are ultimately found to be in violation of the securities laws, to set aside the election, order defendants to resolicit proxies, or grant other necessary relief."); *Wetter v. Caesars World, Inc.*, 541 F. Supp. 68, 74 (D.N.J. 1982) (holding the action expected to be taken at the meeting did not present a threat of irreparable injury because if the proxies are ultimately found to be defective, "the court may set aside the transaction, order a re-solicitation of proxies, or grant any other necessary relief").[10]

### III    The Balance of Equities Tips Strongly In Defendants' Favor

In evaluating a request for a preliminary injunction, the Court must "balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Neuromedical Sys., Inc. v. Neopath, Inc.*, 1998 WL 264845, at *13 (S.D.N.Y. May 26, 1998) (citation omitted). "To demonstrate that the balance of hardships tips in its favor, a movant must show that the harm it would suffer absent the relief sought is substantially greater than the harm its opponent would suffer if relief was granted." *R.R. P.B.A. of State of New York, Inc. v. Metro-N. Commuter R.R.*, 699 F. Supp. 40, 44 (S.D.N.Y. 1988).

The relief Plaintiffs seek would disenfranchise stockholders in contravention of the public interest. *See Mgmt. Assistance Inc. v. Edelman*, 584 F. Supp. 1021, 1025 (S.D.N.Y. 1984) ("A preliminary injunction enjoining defendants from voting any shares of [plaintiff's] stock at the meeting of shareholders for the election of directors would cause severe hardship to

---

[10] To the extent the Court finds a violation of Section 14(a), the proper relief is not to invalidate the proxies already received by City of London, but to require that a corrective disclosure be issued. *See Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. 269, 287, 292-93 (S.D.N.Y. 1995) (irreparable harm only results where proxy statements are materially false and misleading; remedy was to require corrective disclosures prior to meeting and *not* to invalidate proxies).

defendants and those shareholders whose proxies defendants hold."). It would not only prevent the stockholders' vote on the termination proposal to take effect, but prevent the seating of City of London's Nominees, whose election Plaintiffs do not dispute, and keep Rogers and Shore on the Board.  "The hardship alleged by plaintiff, which is essentially denial of fully informed corporate suffrage, is not greater than the hardship that would result from denial of the right of corporate suffrage altogether." *Id*. The proposed relief is also contrary to sound policy and the public interest. *See Allen v. Penn Cent. Co.*, 350 F. Supp. 697, 702 (E.D. Pa. 1972) ("A court must determine whether the shareholders have been given sufficient information to make a rational, well-informed choice; if they have, the court may not substitute its own judgment for that of the shareholders").

**IV**      **Plaintiffs Are Not Entitled to Expedited Discovery**

Courts within the Second Circuit utilize two tests to evaluate the proprietary of expedited discovery requests. *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 402 (S.D.N.Y. 2011). The first test requires application of a "reasonableness standard," under which the party seeking expedited discovery must "prove that the requests are reasonable under the circumstances." *Levy v. Young Adult Institute, Inc.*, 2015 WL 170442, at *6 (S.D.N.Y. Jan. 13, 2015) (quoting *N. Atl. Operating Co. v. Evergreen Distributors, LLC*, 293 F.R.D. 363, 367 (E.D.N.Y. 2013)). The second test requires the moving party to demonstrate:

> (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury the defendant will suffer if the expedited relief is granted.

*Litwin*, 865 F. Supp. 2d at 402 (quoting *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982));

*see also Cecere v. County of Nassau*, 258 F. Supp. 2d 184, 186 (E.D.N.Y. 2003). Plaintiffs fail to meet their burden for expedited discovery under either of the Second Circuit standards.

As discussed at length *supra*, Plaintiffs have failed to demonstrate a probability of success on the merits of their claims and have failed to demonstrate irreparable harm. First, Plaintiffs' allegations are plainly contradicted by the substance of the proxy materials and the uncontroverted facts regarding the Fund. Investors in the Fund have not been denied any information that is substantially likely to alter the total mix of information made available. Second, the result of this stockholder vote is not "irreversible" as Plaintiffs aver. (Mov. Mem. at 33). There is no risk of irreparable harm, as this is not a scenario where the Court cannot "unscramble the eggs" (Mov. Mem. at 32). For this reason alone, the Court should deny expedited discovery.

Plaintiffs' overly broad and burdensome discovery requests fail to satisfy the "reasonableness" standard. *See Raza v. City of New York*, 998 F. Supp. 2d 70, 75 (E.D.N.Y. 2013) ("Even under this more flexible standard, the Court does not find that Plaintiffs have shown sufficient cause to justify expedited discovery or that Plaintiffs' proposed discovery schedule is reasonable, given the breadth of Plaintiff's document requests."). Though Plaintiffs allege their "limited document requests" are "narrowly focused on the relevant issues" (Mov. Mem. at 38), the broad scope of their requests belie this argument. Example one is the time period, which starts *January 1, 2017*, a year before the current fight.

The specific requests are also overly broad.  In Request No. 1, Plaintiffs seek:

> *All documents* concerning *any connection* or relationship between (i) the potential liquidation of the Fund, or merger, business combination or *other strategic alternatives* including China Fund and any other Person; and (ii) the removal or potential removal of the Funds' investment advised, Allianz Global Investors U.S. LLC.

(P. OSC, Ex. A, at 7) (emphasis added). This request broadly seeks all documents connected to Defendants' proposal to replace Allianz or any other potential strategic alternative contemplated by any person. Similarly, Request No. 2 seeks "all documents concerning Your reasons for

making and/or supporting the Termination Proposal" and Request No. 3 seeks "all documents concerning any plans . . . to seek . . . other strategic alternative including China Fund and any other Person." (*Id.*) Plaintiffs' discovery requests are not limited in any meaningful way. Producing responsive documents will require an extensive electronic search and likely require significant and substantive privilege review. Expediting this considerable undertaking is unwarranted and unfeasible before Tuesday, April 10, 2018.

Plaintiffs also ask the Court to order dual-track depositions of Barry M. Olliff, City of London Chief Executive Officer and Chief Investment Officer, and Jeremy Bannister, City of London's Director of Corporate Governance, within three days following the requested document production (by April 13, 2018). Plaintiffs offer no justification why two depositions are needed on such an expedited schedule, nor why the depositions must occur on the same day.

Expedited discovery is not only inappropriate where, as here, Plaintiffs seek all information relevant to their cause of action without narrowly tailoring its requests, but also not required when responding to expedited discovery requests would disproportionately burden Defendants, especially given the broad scope of requested documents and accelerated response period.  In contrast, given the absence of any irreversible threat to Plaintiff's interests, little to no injury would result from delayed discovery. As Plaintiffs failed to satisfy these elements with regard to the standard for a preliminary injunction, Plaintiffs have likewise failed to satisfy this standard for expedited discovery.

## Conclusion

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a temporary restraining order, preliminary injunction, and expedited discovery, and award such other relief in favor of Defendants as the Court deems just and proper.

4570494-1

Dated: New York, New York
April 4, 2018

OLSHAN FROME WOLOSKY LLP

By:    */s/ Adrienne M. Ward*
Thomas J. Fleming
Adrienne M. Ward
Kyle J. Kolb
*Attorneys for Defendants*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

4570494-1